UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                    :

ERIKA WILSON,                       :  Case No.: 1:24-cv-4108
                                      :

                Plaintiff,        :    **COMPLAINT**
                                      :    **AND**
                                      :    **JURY DEMAND**

        – against –          :
                                      :

SELIP & STYLIANOU, LLP; J & E PROCESS   :
SERVERS; and BENJAMIN LAMB.       :
                                      :

              Defendants.     :
------------------------------------------------------------------- X

## PRELIMINARY STATEMENT

1.  Plaintiff Erika Wilson brings this action against Defendants Selip & Stylianou, LLP, J&E Process Servers, Inc, and Benjamin Lamb for their violations of the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. and New York General Business Law § 349 et seq.; for Lamb and J&E's violations of N.Y.C. Admin. Code § 20-409.2; and for Selip's violations of New York Judiciary Law § 487 et seq.

2.  In May 2023, Defendant Selip as counsel for an original creditor filed suit (the "collection lawsuit") against Ms. Wilson in Bronx County Civil Court. It contracted J&E Process Servers to effect service on Ms. Wilson. In turn, J&E contracted process server Benjamin Lamb—a notorious perpetrator of sewer service who had been sued 15 years earlier for falsifying affidavits of service and claiming service attempts that were impossible, like service at two addresses at the exact same time. Selip knew that J&E regularly contracted Lamb to effect service because it had been doing so for many years.

3.  Lamb submitted an affidavit of service claiming to have served Ms. Wilson's co-

tenant, which J&E notarized and at Selip's direction, filed with the court. On the same day, he also submitted to J&E multiple affidavits of service in other cases that reflected physically impossible attempts at service.

4.    Lamb's affidavit in Ms. Wilson's case was also false: on the day of alleged service, June 8, 2023, Ms. Wilson and her mother (the only other person who lived with her) were at Mount Sinai West watching over Ms. Wilson's two-day-old daughter, who was hospitalized in the Neonatal Intensive Care Unit. Neither of them received the summons and complaint.

5.    As a result of Defendants' conduct, Ms. Wilson did not learn about the case against her until late July, when she received a bare-bones, one-page notice from the court informing her that she had been sued. This notice was not the Complaint, and thus did not inform Ms. Wilson of the specific allegations against her.

6.    At the time, Ms. Wilson was home with her newborn daughter, who had been discharged in mid-June. The notice caused Ms. Wilson to become anxious and have trouble sleeping, on top of the stress and sleep deprivation she was experiencing as a new mother and her worry about her daughter's health.

7.    Ms. Wilson was able to obtain representation from a legal services organization, CAMBA Legal Services, and worked with her lawyer to file a motion to dismiss the case on the ground that she was never served and the court lacked jurisdiction.

8.    Yet Selip, even though it now had been put on notice by Ms. Wilson that the affidavit in Ms. Wilson's case was false (as were other affidavits of service from that day), refused to discontinue the case. It instead opposed Ms. Wilson's motion. The court ultimately set the matter down for an evidentiary hearing to determine whether service was proper. Ms. Wilson must now spend more time, money, and emotional energy to prepare for this hearing.

9. She now seeks to hold Defendants accountable for their conduct.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 15 U.S.C. § 1692k(d), which provides that civil actions for violations of the Fair Debt Collection Practices Act may be brought in any appropriate United States district court without regard to the amount in controversy.

11. This Court has supplemental jurisdiction over Ms. Wilson's state law claims because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a).

12. Declaratory relief is available under 28 U.S.C. §§ 2201(a) and 2202.

13. Venue is proper under 28 U.S.C. 1391 because all or a substantial part of the events or omissions giving rise to Ms. Wilson's claims occurred in this district. Specifically, Plaintiff sued Ms. Wilson and purported to serve her with process in Bronx County.

## THE PARTIES

14. Plaintiff Erika Wilson is a natural person residing in Bronx County, New York.

15. Ms. Wilson is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3)(5), in that she was allegedly obligated to pay a debt arising out of a transaction in which the subject money was primarily for personal, family, or household purposes – in this case a "CareCredit-branded revolving credit account."

16. Defendant Selip & Stylianou LLP ("Selip") is a law firm and registered limited liability partnership organized under the laws of the State of New York. Its principal place of business is 199 Crossways Park Drive, PO Box 9004, Woodbury, NY 11797. Selip is a debt

collection law firm and is registered as a debt collection agency with DCWP, license number 2045186-DCA.

17. Selip regularly collects on consumer debts owed or due another by sending thousands of collection letters, filing thousands of collection lawsuits, and collecting on judgments by using information subpoenas, bank restraints, and income executions. The collection of consumer debts is the principal purpose of Selip's business. Selip is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

18. Defendant J & E Process Services, Inc., ("J&E") is a corporation organized under the laws of the State of New York with its principal place of business located at 901 N. Broadway, White Plains, NY 10603. It is registered as a process serving agency with the New York City Department of Consumer and Worker Protection ("DCWP," formerly known as the New York City Department of Consumer Affairs, or "DCA"). Its license number is 2027471-DCA. J&E is a division of Inter County Judicial Services, LLC ("Inter County"), a limited liability corporation organized under the laws of the State of New York. It is registered as a process serving agency with DCWP, license number 1371771-DCA, under the same business address as J&E—901 N. Broadway, White Plains, NY 10603. J&E's operations are intertwined Inter County's: in addition to sharing a physical office, they share employees and a business website, www.intercountyjudicial.com.

19. J&E regularly fails to serve summons and complaints, and regularly executes and submits false affidavits of service allowing the entry of default judgments against putative consumers to collect putative consumer debts. J&E is therefore a debt collector within the meaning of 15 U.S.C. § 1692a(6).

20. Defendant Benjamin Lamb is a natural person who serves process for J & E

Process Servers. He is registered as an individual process server with DCWP, license number 1071492-DCA. He executed a false affidavit of service claiming he served the collection lawsuit on Ms. Wilson. Lamb has a documented history of falsifying affidavits of service, and of claiming to have served people he never served.

21. Lamb regularly fails to serve summons and complaints and regularly executes false affidavits of service allowing debt collectors, including Selip, to ultimately enter default judgments against consumers who are never served and never appear in the case against them. Lamb is therefore a debt collector as defined by 15 U.S.C. § 1692a(6).

22. At all times described in this Complaint, Lamb was acting in the scope of his employment or contract with J&E.

## STATUTORY AND REGULATORY FRAMEWORK

23. To commence a lawsuit against a natural person in New York, a plaintiff must serve the summons and complaint on the defendant by one of three methods: personal service, substitute service, and nail and mail service.

24. Personal service is personal delivery of the summons and complaint. CPLR § 308(1).

25. Substitute service" requires delivery in person on "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served," and mailing the summons and complaint to the person to be served's last known residence or actual place of business. *Id.* § 308(2).

26. Finally, if with due diligence the person cannot be served by personal service or substitute service, they may be served by "nail and mail" service: "affixing the summons [and complaint] to the door of either the actual place of business, dwelling place or usual place of

abode within the state of the person to be served," and mailing the summons and complaint to the last known residence or actual place of business. *Id.* § 308(4).

27. An affidavit of service must then be filed with the court. When service is made by substitute service, the affidavit must "identify" the individual who was served; include "a description of the person [served], including, but not limited to, sex, color of skin, hair color, approximate age, approximate weight and height, and other identifying features"; and "state the date, time and place of service." *Id.* §§ 306(a-b), 308(2).

28. If a defendant fails to appear or submit an answer, the plaintiff may file an application for a default judgment against that defendant. *Id.* § 3215(a). This application must include a copy of the affidavit of service. *Id.* § 3214(f).  A default judgment may then be administratively entered by the clerk of court. *Id.* § 3215(a).

29. A debt collector who obtains a judgment against a consumer may execute on that judgment by garnishing the consumer's wages or levying their bank accounts, with no judicial approval required, for the next twenty years. *Id.* §§ 211(b), 5231, 5232.

30. However, a New York court lacks personal jurisdiction over any individual who was not lawfully served with process, and such an individual may move to dismiss an action, or vacate a judgment, on this basis. See N.Y. C.P.L.R. §§ 3211(8), 5015(a)(4). A court faced with such a motion may dismiss the action out right or may set the matter down for an evidentiary hearing, called a traverse hearing, to determine whether service was proper.

31. All process servers and process serving agencies must be licensed by the New York City Department of Consumer and Worker Protection (DCWP) and must follow rules and regulations issued by the City. N.Y.C. Admin. Code § 20-403 *et seq.*

32. All New York City process servers must maintain electronic or paper logbooks in

which they record information about all instances of service and attempted service in a prescribed format. N.Y. G.B.L. § 89-cc. Each entry must contain, among other information, the title, court, and index number of the action; the type of service attempted and/or effected; the name and physical description of the person served; the date, time, and address when service was effected. *Id.* § 89-cc(2); 6 RCNY § 2-233(a,b). When service is effected by nail and mail, the record must include a description of the door where the papers were posted and the adjacent area, including the color and composition of hallway walls, floor, and doorstep, and the location of the premises in relation to the stairs, elevator, or entranceway. *Id.* § 2-233(a)(2)(xvi).

33. Process servers and agencies may not "may not "sign or notarize or cause to be signed or notarized an affidavit of service until all factual averments have been set forth" and they may "not make a false statement in an affidavit of service." *Id.* § 2-235.

34. All New York City process servers must maintain GPS records of their location at all times while carrying out their process serving duties. N.Y.C. Admin. Code § 20-410.

35. All New York City process serving agencies must "be legally responsible for any failure to act in accordance with the laws and rules governing service of process by each process server to whom it has distributed, assigned or delivered process for service." N.Y.C. Admin. Code § 20-406.2(b). They must conduct monthly reviews of the records of each individual process server to whom they distribute process. RCNY § 2-234a(b)(2)(i)-(ii). Process serving agencies must not distribute process to any process server who "does not display integrity and honesty in his or her process serving activities" or who otherwise does not comply with the applicable rules. RCNY § 2-234a(a). The agency must also take disciplinary action against any individual process server who fails to comply with the law. *Id.* § 2-234a(b).

36. DCWP may file disciplinary charges against process servers and agencies who fail

to comply with the applicable laws and rules.

## FACTS

### *Lamb's History of Sewer Service and Falsifying Affidavits of Service*

37. Defendant Lamb has a long history of sewer service—i.e., intentionally failing to serve process—and of falsifying affidavits of service.

38. He was a defendant and key malfeasor in *Sykes v. Mel S. Harris, et al.*, a federal class action targeting a massive, illegal debt collection scheme by debt collectors, debt collection law firms, and process servers. A crucial feature of that scheme was Lamb and the other process server defendants' pattern of failing to serve process but swearing in court-filed affidavits of service that they had. This practice ensured that consumers were never notified of the lawsuits against them, which enabled the debt collectors to easily obtain default judgments.

39. In the 2012 decision granting class certification in *Sykes*, the district court found Lamb consistently lied about the service he was supposed to perform and repeatedly claimed to be serving multiple individuals at the exact same time. *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 284 (S.D.N.Y. 2012), *aff'd sub nom. Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015). On many other occasions, Lamb's purported attempts at service were "so close in time that it would have been impossible for [him] to travel from one location to the other as claimed." *Id.*

40. The court's findings of fact were based on the expert declaration of an IT consultant, Nicholas Egleson (*see id.*), which provided further detail than was included in the court's decision. Egleson based his declaration testimony on his comprehensive analysis of all service of process performed by Lamb's former agency (one of the defendants in *Sykes*) from

January 2007 through January 2011. **Exhibit A** (Egleson Declaration). This included over 16,000 affidavits of service completed by Lamb.

41. Egleson reported that on 66 occasions Lamb outright lied, claiming to have served process in two separate locations at the exact same time—an impossibility. *Id.*

42. Lamb also reported physically impossible travel times and nonsensical routes. (*Id.* at ¶¶ 13, 16.) For example, "on December 8, 2008, while serving defendants in the Bronx, Defendant Lamb reported having completed 12 hours and 15 minutes of travel in seven hours and 10 minutes. On that day alone, Defendant Lamb consistently backtracked among zip codes and also reported 10 instances when he was in two different locations at the exact same time." (*Id.* ¶ 19.)

43. As part of his pattern of improper service, Lamb would almost always allege that he had performed substitute service.

44. In at least 15,000 of the Lamb affidavits inspected by Egleson, or 91.2 percent, Lamb alleged substitute service. In comparison, Lamb allegedly only completed personal service 5.41 percent of the time and only completed nail and mail service .03 percent of the time.

45. Also in 2012, the Department of Consumer Affairs brought disciplinary charges against Lamb. He resolved the charges by signing a Consent Order agreeing to pay a fine of $500 and agreeing to follow all the Department's rules and regulations. **Exhibit B** (2012 Consent Order).

46. On August 7, 2013, Lamb appeared for a traverse hearing in Bronx County Civil Court in *Palisades Collection v. Teresa Smith*, CV-020105-06/BX regarding an affidavit of service he executed regarding purported service in 2006. At that hearing, he was "confronted with information showing that on two occasions he served two people at the same time" and

claimed those were mere typographical errors. On November 3, 2013, the court found Lamb's testimony "totally unbelievable," concluded the defendant was never served and vacated the judgment. **Exhibit C** (*Smith* Traverse Decision).

47. Since 2013, numerous traverse hearings have been held regarding Lamb's affidavits of service, and traverse has repeatedly been sustained and service found to have been improper. Often, this finding has been based on Lamb's failure to appear at the hearing or his failure to produce his logbook or GPS records. **Exhibit D** (Traverse Reports).

48. In January 2020, DCA served Lamb with an order to produce his logbooks for October 2018 through September 2019, and other documents relating to his process serving activities, then followed up with a reminder in February 2020. When Lamb failed to produce the required documents, DCA on or around March 3, 2020 suspended his license pending compliance with the order. **Exhibit E** (2020 Lamb Suspension).

49. In February 2020, DCA issued a summons to Lamb for failing to report the scheduling of two traverse hearings in October 2019 regarding service in 2018, and directed him to appear at an administrative hearing. This summons was later withdrawn. **Exhibit F** (DCA Summons 200020HR and Notice of Withdrawal).

50. In On September 17, 2020, a default decision was issued against Lamb relating to a different summons, No. 2000002CS, and those allegations—of violating 6 RCNY § 1-13--were deemed admitted and he was fined $500. **Exhibit G** (September 2020 Default Decision).

51. In June 2022, DCA served a subpoena on Lamb seeking his process serving records from March 2022, which Lamb complied with. Based on those documents, in November 2022, DCA issued yet another summons to Lamb, charging him with various violations of the rules governing process servers. Specifically, in March 2022 alone, Lamb: 1) claimed in an affidavit

of service that he made service on March 23, 2022 at 11:17, while his GPS records only showed

he was in that location on March 22, 2022 at 11:20 a.m.; 2) for one case, did not identify in his

logbook the nature of the papers served; and 3) did not include his license number on three

affidavits of service. **Exhibit H** (2022 DCA Summons).

52. In a consent order signed and dated March 2, 2023, Lamb pled guilty to three of the

four counts, agreeing to pay a fine of $1,125 upon execution of the consent order and to follow

the rules governing process servers going forward. **Exhibit I** (2023 Consent Order)

53. But Lamb did not pay his fine, as he had promised to do, and DCA suspended his

license on May 23, 2023 for his failure to pay. **Exhibit J** (2023 Lamb Suspension). The

following day, Inter County Judicial Services LLC paid Lamb's fine. **Exhibit K** (Payment

Receipt)

### *Defendants Falsely Claim to Have Served Ms. Wilson*

54. Erika Wilson is a 34-year-old resident of Bronx County, New York. She lives at

3540 Decatur Ave., Apt. 1G, Bronx, NY 10467 with her mother, Shemin Wilson and her 1-year-

old daughter R. Ms. Wilson and her mother have lived at that address for nearly 12 years.

Although Ms. Wilson used to work as an elementary school teacher, she now cares for her

daughter full-time.

55. On May 30, 2023, Synchrony Bank, through its counsel Selip, purchased an index

number for a suit against Ms. Wilson in Bronx County Civil Court. A true and correct copy of

the Summons and Complaint are attached as **Exhibit L**. The summons was labeled as a

"Consumer Credit Transaction," and the Complaint alleged that Ms. Wilson had opened a

CareCredit branded credit card with Plaintiff, incurred a balance, and ultimately defaulted.

The Summons and Complaint was signed by Donna A. Ciampa, Esq., on behalf of Selip.

56. Selip then contracted J&E to distribute process in this case, and J&E contracted Lamb to effect service. They did so less than a month after Inter County, J&E's parent company, paid Lamb's fine for his multiple violations of the rules governing process servers.

57. On June 21, 2023, J&E, acting as agent of Selip, filed an affidavit of service in the case via the New York state court system's Electronic Document Delivery System (EDDS). A true and correct copy of the affidavit of service is attached as **Exhibit M**. A true and correct copy of the EDDS Notification of Receipt, provided by Selip as an exhibit in the civil court case, is attached as **Exhibit N**.

58. On information and belief, Selip directed J&E to file the affidavit of service via EDDS. It is unclear who at J&E filed the affidavit of service: the Notification of Receipt states the documents were sent by "Ellen Eakley," but the email address provided for the sender was dawn@jeprocess.com and the Notification was sent to "Dawn Diforio."

59. The affidavit of service was executed by Defendant Lamb on behalf of "J and E Process Service, Inc." (**Ex. M.**) It was purportedly signed and notarized on June 16, 2023 before Melissa A. Cyran, identified as a notary public qualified in Westchester County. *Id.*

60. On information and belief, Melissa A. Cyran is an employee of and/or performs work for both J&E and Inter County.

61. In the affidavit of service, Lamb swore that he served the summons and complaint on June 8, 2023 at 3:16 p.m. on Ms. Wilson's alleged cotenant, "Chante Wilson" at 3540 Decatur Ave., Apt. 1G, Bronx, NY 10467. "Chante Wilson," Lamb claimed, was a Black woman with black hair, exactly 25 years old, standing 5'4" to 5'6" tall, and weighing 131-160 pounds. (Ex. B.) He alleged that he asked "Chante Wilson" whether the defendant "was in the active military service of the United States or the State of New York in any capacity whatever" and

received a negative reply. (*Id.*) Lamb further alleged that he mailed a copy of the summons and complaint to Ms. Wilson at the same address on June 16, 2023.

62. But Ms. Wilson did not receive the summons and complaint, and every single statement in Mr. Lamb's affidavit of service was false.

63. On June 8, 2023, the only people who lived at 3450 Decatur Ave., Apt. 1G, were Ms. Erika Wilson and her mother Shemin Wilson.

64. No one named Chante Wilson lived with them in June 2023 or ever, and there is no one by that name in Ms. Wilson's family. Nor has anyone matching Chante Wilson's description ever even been in Ms. Wilson's apartment.

65. In fact, no one would have been home at Ms. Wilson's apartment on June 8, 2023, at 3:16 p.m. because both Ms. Wilson and her mother were at Mount Sinai West Hospital, where Ms. Wilson's daughter R had just been born and was in the neonatal intensive care unit (NICU).

66. R was born on June 6, 2023 with fluid in her lungs and was immediately admitted to the NICU. On R's third day in the NICU, hospital staff determined R had infant jaundice and needed to stay another day to receive phototherapy treatment. R was discharged on June 10, 2023.

67. Ms. Wilson stayed with R during her entire stay in the NICU and did not leave until R was discharged. Shemin Wilson stayed with Ms. Wilson and R for the entirety of visiting hours each day of R's stay, from 10 a.m. through 9 p.m., including on June 8, 2023 at 3:16 PM when Lamb alleged service.

68. So, on the day of alleged service, no one would have been home at 3450 Decatur Ave., Apt. 1G at 3:16 PM or at any time between 10 a.m. and 9 p.m.

69. Ms. Wilson was never served and Lamb lied in his affidavit of service, just as he has countless times over the last two decades. This was not an isolated occurrence.

70. In addition to the public records evidencing Lamb's long history of sewer service and falsified affidavits of service, Ms. Wilson's counsel uncovered additional examples of plainly impossible claims to service.

71. Matthew Schedler, Of Counsel at CAMBA Legal Services, Inc., reviewed and copied 39 affidavits of service from all the index numbers surrounding the index number for the civil court action against Ms. Wilson in which an affidavit of service was in the file (CV-5340-23/BX through CV-5394-23/BX). **Exhibit O** (39 Sequential Affidavits of Service). These 39 affidavits of service were all executed by Lamb for J&E, in cases brought by Selip as counsel for a creditor. All 39 affidavits of service were notarized by Melissa A. Cyran and were filed on EDDS.

72. All 39 affidavits of service claim substitute service. 34 out of 39 affidavits of service list the name of the person served, and all state that the person served "gave a negative reply" when asked whether the defendant had served in the military.

73. They also contain impossible claims to service. Earlier on the same day that Lamb claimed he served "Chante Wilson," Lamb also allegedly completed substitute service on at 640 Adee Ave., Apt. 13G, Bronx, NY, at 2:40 p.m., followed by substitute service at 2304 Matthews Ave., Apt. 1, Bronx, NY 10476 at 2:49 p.m. **Ex. O**, pp. 59-60. Both affidavits of service were notarized by Melissa Cyran on June 16, 2023.

74. According to Google Maps, the driving distance between the latter two locations is at least six minutes by car.

75. According to Google Maps, 640 Adee Ave. appears to be a 15-story apartment

building with multiple units on each floor. The building is set back from the road and is up a small hill. **Exhibit P** (Google Maps Street View Printout of 640 Adee Ave.).

76. According to Google Maps, 2304 Matthews Ave is a freestanding, multi story private home in which the front door is up a flight of stairs. The home is surrounded by a metal gate. **Exhibit Q** (Google Maps Street View Printout of 2304 Matthews Ave.).

77. To complete service at 2304 Matthews Ave., nine minutes after he completed service at 640 Adee Ave., Apt. 13G, Lamb would have had to walk to the elevator from the unit, descend from the 13th floor to the ground floor of Adee Ave., walk out to the road, walk to wherever he parked his vehicle, note down the description of the person served and the information concerning service (either in his logbook or in some other form to preserve his recollection to submit electronically), drive the minimum six minutes to 2304 Matthews, or more with traffic, find the address, find parking, park his car, gather the papers to be served, walk to 2304 Matthews, enter the gate, climb the front stairs, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether the defendant had been in the military, and then hand them the summons and complaint.

78. On information and belief, it would be impossible to do all that in nine minutes.

79. Later that month, Lamb again claimed, impossibly, to have served two individuals in just 10 minutes. He claimed that on June 17, 2023, at 3:54 p.m., he served an individual by substitute service at 4356 Grace Ave., Bronx, NY 10466. Then, at 4:04 p.m., he allegedly again performed substitute service at 4:04 p.m. at 3916 Harper Ave., Apt. 9, Bronx, NY 10455. Both affidavits of service were notarized by Melissa Cyran on June 26, 2023 and filed on EDDS.

80. According to Google Maps, the driving distance between 4356 Grace Ave. and 3916 Harper Ave. is six minutes.

81. According to Google Maps, 4356 Grace Avenue appears to be a small two-story home with a gate around the front yard and steps leading up to the door. **Exhibit R** (Google Maps Street View Printout of 4356 Grace Ave.). 3916 Harper Ave. appears to be part of an adjoining set of multilevel apartments set back from the road. **Exhibit S** (Google Maps Street View Printout of 3916 Harper Ave). There are 7 doors visible from the street, each labeled with a different street address, e.g. "3916," or "3914." There is no lobby or doorman, and individual apartment numbers (e.g. "9") are not visible from the outside. To get to "3916," a visitor would have to climb two flights of stairs.

82. To complete service at 3916 Harper Ave. 10 minutes after completing service at 4356 Grace Ave., Lamb would have had to descend the steps at Grace Ave., open the gate, walk to and enter his vehicle, memorialize the details of service, drive the minimum six minutes to 3916 Harper Avenue or more with traffic, find parking, park his car, gather the papers to be served, figure out which door to knock on, ascend the stairs, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, then finally hand them the summons and complaint.

83. On information and belief, it would be impossible to do all that in ten minutes.

84. In addition to these impossible descriptions of service, the 39 affidavits pulled on Ms. Wilson's behalf show that Lamb never claimed personal service on a defendant and never claimed affix and mail service. In other words, Lamb claims to have knocked on the doors of 39 homes, and that each time, no one was home—instead, a third party answered the door, told that stranger at the door that the defendant was not in the military, and then accepted service. This is implausible and does not survive scrutiny.

85. Alleging substitute service allows Mr. Lamb to avoid scrutiny of his false affidavits

of service. This would not be possible if he were to falsify attempts at personal service because an inaccurate, fabricated description of the defendant could be easily countered by the defendant's actual physical appearance. And if Lamb falsely alleged affix and mail service, he would have to make required GPS recordings and describe the physical appearance of the door and adjacent area, both of which can be easily verified. Substitute service cannot be so objectively rebutted, because it requires the defendant to prove a negative—that no person matching the description in the affidavit of service would have been at the residence at the time of service. On information and belief, Lamb regularly falsifies his affidavits of service.

86. To further confirm Selip, J&E, and Lamb's pattern and practice of falsifying affidavits of service, Ms. Wilson's counsel also examined a sample of affidavits of service in cases filed by Selip in two other randomly selected time periods, early 2023 and late 2021. *See* **Exhibit T** (2022 Lamb Affidavits), **Exhibit W** (Additional 2023 Lamb Affidavits). Many of these cases were contracted to J&E for service of process, who in turn contracted many of this subset to Lamb.

87. Unsurprisingly, Lamb's affidavits of service in these cases also contained multiple examples of impossible attempts at service and clearly falsified affidavits. And the vast majority alleged substitute service.

88. On January 5, 2022, Lamb claimed to have completed substitute service at 4160 Hutchinson River Parkway E, Apt. 3A, Bronx, NY, at 4:22 p.m., followed by substitute service at 140 Erdman Place, Apt. 2F, Bronx, NY just four minutes later at 4:26 p.m. **Exhibit T, pp. 14-15.** Both these affidavits of service were notarized by Melissa Cyran on the same day and filed by J&E via EDDS.

89. According to Google Maps, the driving distance between these two addresses is 6

minutes. Lamb could not have effected service at these addresses just 4 minutes apart.

90. On January 25, 2022, Lamb claimed to have served someone at 100 Erskine Place, Apt. 9F at 12:09 p.m. and someone else at 100 Donizetti Place, Apt. 25G at 12:26 p.m. **Exhibit T, pp. 25-26**. Both these affidavits of service were notarized by Melissa Cyran on the same day and filed by J&E via EDDS.

91. According to Google Maps (**Exhibit U** and **Exhibit V**), both of these addresses are high-rise apartment buildings, and the driving distance between these two addresses is 10-12 minutes. In just 17 minutes, Lamb could not have descended 9 floors at 100 Erskine Place, walked to and entered his vehicle, memorialized service, driven 10-12 minutes to 100 Donizetti Place, found parking, parked his car, gathered the papers to be served, gained access to the building, ascended 25 floors, figured out which unit was 25G, knocked on the door, waited for someone to answer the door, asked that person their name, asked that person whether they had been in the military, then finally handed them the summons and complaint.

92. On January 31, 2023 Lamb swears that he completed substitute service at 1:21 P.M. at 1233 Arnow Avenue, Bronx, NY 10469. Lamb then swears that he performed substitute services 3 minutes later at 2523 Paulding Avenue, Apt. 1F, Bronx, New York 10469. **Exhibit W**, pp. 7-8. Both affidavits of service were notarized by Melissa Cyran on February 7, 2023 and submitted on EDDS.

93. According to Google Maps, the driving distance between these two locations is 3 minutes.

94. To complete service at 2523 Paulding Avenue, 3 minutes after he completed service at 1233 Arnow Ave., Lamb would have had to exit Arnow Ave., walk to his vehicle, fill out the description of the person served and the information concerning service in his logbook,

drive the minimum 3 minutes or more with traffic, find the next address, find parking, park his car, gather the papers to be served, ring the buzzer, wait for someone to answer the buzzer, go to the door, knock, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, and then hand them the summons and complaint.

95. On information and belief, it would be impossible to do all that in 3 minutes.

96. The next day on February 1, 2023 Lamb again claimed, impossibly, to have served two individuals in just 5 minutes. He claimed that on February 1, 2023 at 1:29 p.m., he served an individual by substitute service at 2612 Chesbrough Avenue, Apt. 2, Bronx, NY 10461. Then, at 1:34 p.m., he allegedly again performed substitute service at 2437 Lyvere Street, Apt. 1J, Bronx, NY 10461. Both affidavits of service were notarized by Melissa Cyran on February 7, 2023 and filed on EDDS.

97. According to Google Maps, the driving distance between 2612 Chesbrough Avenue and 2437 Lyvere Street is 7 minutes. 2612 Chesbrough Avenue is a small multifamily home with steps leading up to the door. **Exhibit X** (Google Maps Street View Printout of 2612 Chesbrough Avenue). 2437 Lyvere Street is a large apartment building with many units. **Exhibit Y** (Google Maps Street View Printout of 2437 Lyvere).

98. To complete service at 2437 Lyvere Street 5 minutes after completing service at 2612 Chesbrough Avenue., Lamb would have had to descend the steps at Chesbrough., walk to and enter his vehicle, fill out the description of the person served and the information concerning service in his logbook, drive the 7 minutes to 2437 Lyvere Street, find parking, park his car, gather the papers to be served, gain access to the building, find and walk to the apartment, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, then finally hand them the summons and complaint. Upon

information and belief it would be impossible to perform service and drive the 7 minutes

between locations in 5 minutes.

99. Lamb again alleges impossible service on February 6, 2023.  On this date he claims

he performed substitute service at 867 Kinsella Street Bronx, NY 10462 at 1:22 p.m. and then

again performed substitute service 6 minutes later at 1: 28 p.m. at 759 Van Nest Avenue, Bronx,

NY 10462. **Exhibit W, pp. 34-35.** Both affidavits of service were notarized by Melissa Cyran on

February 8, 2023 and filed on EDDS.

100.  According to Google Maps, the driving distance between these two locations is 8

minutes.

101.  867  Kinsella Street and 759 Van Nest Avenue are both small a small multifamily

homes. **Exhibits Z and AA.**   759 Van Nest has a large set of stairs to the front door. To

complete service at 759 Van Nest Avenue 6 minutes after he completed service at 867 Kinsella

Street, Lamb would have had to walk to his vehicle, fill out the description of the person served

and the information concerning service in his logbook, drive the minimum 8 minutes to or more

with traffic, find the address, find parking, park his car, gather the papers to be served, drive to

759 Van Nest, climb the stairs to the door, wait for someone to answer the door, ask that person

their name, ask that person whether they had been in the military, and then hand them the

summons and complaint.

102.  Upon information and belief this it would be impossible to perform service and

travel the 8 minutes between locations in 6 minutes.

103.  Selip regularly hires J&E to serve process on its behalf. This is evidenced by the

affidavits of service discussed above, from both early 2022 and summer 2023, and by an undated

testimonial on J&E/Inter County's website from "Mitchell Selip, Esq., Selip & Stylianou LLP"

stating that "[his] firm has been using Inter County Judicial for almost two years now." *See* Inter County Judicial Services, Westchester Office, https://intercountyjudicial.com/westchester/ (last visited May 29, 2024).

104.  Selip contracts J&E knowing that J&E frequently contracts Lamb and has done so for years, and that Lamb has a history of falsifying its affidavits of service.

105.  J&E notarizes Lamb's affidavits without review even though Lamb has a long history of failing to serve process and falsifying affidavits, his affidavits for J&E swear to facts that are impossible on their face, and plainly incompatible affidavits from the same alleged day of service are presented at the same time to the same person at J&E (Melissa Cyran).

106.  Either J&E is, in reckless disregard of the rights of consumers, failing to perform basic supervision of Lamb that would lead to scrutiny of his facially ridiculous claims of service, or J&E is reviewing the affidavits, seeing the claims of physically impossible service, and nevertheless notarizing and submitting them in disregard to its obligation of making truthful representations of service to the courts.

107.  Had J&E exercised any care in reviewing Lamb's affidavits of service, it would have realized he was falsifying them and would have disciplined Lamb, stopped distributing process to him, and/or contracted with another process server to serve Ms. Wilson.

108.  On information and belief, Selip directs J&E to file the affidavits of service on EDDS on Selip's behalf. On information and belief, Selip fails to review the affidavits of service before they are filed, or reviews them and ignores the physical impossibilities they present.

**_Defendants' Sewer Service Distresses Ms. Wilson and Forces Her to Travel to Fight the False_**
**_Allegations Service_**

109.    Because Ms. Wilson was never served, she did not receive the summons and complaint on June 8, 2023 nor did she receive it in the mail in the days following. She did not learn about the case until the end of July – and even then, she did not receive the summons and complaint. She received instead a notice from the courts that was devoid of substantive information, so she did not know what the collection lawsuit was about.

110.    After returning home from the hospital with R., Ms. Wilson's sole focus was her new baby, whose health she continued to worry about. She had to monitor the R.'s breathing through the night. She had to go back and forth to the doctor's appointments to check R.'s bilirubin levels to determine whether the jaundice needed further treatment. She had difficulty getting R. to nurse and worried about whether she was getting enough nourishment. And R. woke frequently throughout the night, making Ms. Wilson sleep deprived. Although the baby's father, Ms. Wilson's fiancé was involved, help him was limited because he was working full-time.

111.    Near the end of July, Ms. Wilson received in the mail a notice from the Bronx County Civil Court informing her that she was being sued. The notice contained the case caption and index number but no substantive information about the claims against her.

112.    Ms. Wilson began to panic. She had no idea what Plaintiff's allegations were, or how she could go about addressing them. She did not know how she could get the court papers. She worried about how she would go to court to respond when she didn't know what the case was about and given that she was the sole caretaker of her infant daughter. She was afraid she would be arrested if she did not go to court immediately, but didn't know how she could go to

court under the circumstances. If she was arrested, she wondered, what would happen to her daughter? Who would take care of R.? And if she did go to court, given that the creditor would have a lawyer and she didn't, what would happen then?

113.  Although Ms. Wilson shared a few of these fears with her mother and fiancé, she mostly kept them to herself. But they weighed on her and prevented her from sleeping, worsening the sleep deprivation she was already suffering as a brand-new mother. She was exhausted.

114.  Ms. Wilson's stress also impacted her baby during this time: R. could sense when her mother was stressed, worried, or distracted, and in response would become more restless and upset, and would resist sleep. When Ms. Wilson noticed the change in her baby's demeanor, she would have to bury her fears to become more outwardly calm. She immediately saw a difference in R., but she felt guilty and sad that her worries were impacting her baby, whose health was already fragile.

115.  Ms. Wilson began calling different organizations but could not find anyone to help her. Eventually, however, she connected with CAMBA Legal Services, Inc. ("CAMBA"), a nonprofit legal service provider and Ms. Wilson's counsel in this federal case, who agreed to do an intake with her and ultimately agreed to represent her. Ms. Wilson had to take the subway from the Bronx to CAMBA's offices in Flatbush, Brooklyn, and had to bring R. with her because she had no other childcare. She worried about exposing R.'s vulnerable respiratory system to potential infection on public transportation.

116.  After reviewing the affidavit of service and realizing that it had been falsified, Ms. Wilson through her counsel filed a motion to dismiss. **Exhibit BB** (Motion to Dismiss)

117.  In order to prepare and execute her affidavit in support of her motion to dismiss,

Ms. Wilson had to travel again from her home in the Bronx to CAMBA's offices in Flatbush, Brooklyn. Her mother drove her, and Ms. Wilson paid for gas and for parking in a metered spot.

118.   The motion to dismiss detailed why Lamb's allegations in the affidavit of service had to be false. *Id.*, pp. It also detailed the disturbing pattern of impossible claims of service that was revealed by CAMBA's review of the 39 affidavits of service in the cases filed by Selip close in time to Ms. Wilson's. *Id.,* pp.

### *Selip Doubles Down on Sewer Service by Fighting the Clearly Meritorious Motion to Dismiss*

119.   Despite this evidence, Selip refused to discontinue the case and instead opposed Ms. Wilson's motion to dismiss, maintaining that Lamb's affidavit constituted "prima facie evidence of proper service" and that Lamb's history of falsifying affidavits was irrelevant. **Exhibit CC** (Opposition to MTD).

120.   Ms. Wilson's counsel submitted a Reply and the motion was submitted to the court. **Exhibit DD** (Reply).

121.   On April 26, 2024, the court issued a decision granting Ms. Wilson's motion to the extent of setting the matter down for a traverse hearing on June 5, 2024. **Exhibit EE** (Order for Traverse). The prospect of having to prepare for and appear in court for a hearing caused Ms. Wilson additional stress and anxiety.

### *Selip's History of Using Sewer Service*

122.  Ms. Wilson is not the first consumer to be deceived by Selip using a false affidavit of service from a process server it knew or should have known was systemically engaging in sewer service.

123.  Selip's history of sewer service spans decades and multiple prior firm names (i.e. Upton, Cohen and Slamowitz).

*Levy*

124. On or about October 24, 2002, Selip filed a collections lawsuit in New York County Civil Court against a consumer named Isaac Levy. **Exhibit FF** (*Levy* Complaint).

125. Selip chose the process serving company Capital Process Servicers, Inc. ("CPS, Inc.") to execute an affidavit of service. Process server Gerald Murray, working for CPS, Inc. (collectively "CPS") swore before a notary that on October 11, 2002 he served the summons and complaint on Mr. Levy by delivering and leaving the documents with "a Jane Doe Cotenant" a resident at Mr. Levy's dwelling which he listed as 151 1st Ave #42 New York, NY 10003-2965. Mr. Murray stated that the Jane Doe refused to give her name and he described her as a 36-50 year old white female who was approximately 5'4"-5'8" tall and weighed 131-160 lbs. *Id.*

126. Mr. Levy had never lived at the address where CPS alleged service. Moreover, Mr. Levy has never lived with anyone bearing the description of the "Jane Doe" Mr. Murray described. His roommate was 24 years old and had black hair. *Id.*

127. Both CPS and Mr. Murray specifically are notorious for systematically executing false affidavits of service.

128. The DCA subsequently forced Gerald Murray to surrender his license in 2013 based on misconduct in allegedly serving process, including falsifying affidavits of service. *Id.*

129. CPS has also been disciplined by the DCA for violations of DCA rules regulating process servers. In February 2013, CPS entered into a consent order with DCA whereby CPS paid a $35,000 penalty and was required to adopt policies to protect against sewer service. *Id.*

130. Selip used the false affidavit of service to enter a default judgment against Mr. Levy on December 15, 2003 for $1,748.47 plus 9 percent post judgment interest, or approximately $4,100 as of the date of the filing of this FDCPA action. *Id.*

131.  On December 5, 2018, Mr. Levy filed a lawsuit against Selip, CPS, Murray, and others for violations of the FDCPA for the sewer service and other misconduct stemming from it. *Id.*

132.  The case was settled for a confidential amount and dismissed on March 11, 2020.

*Maria*

133.  On March 1, 2012, Selip initiated a lawsuit in New York County Civil Court, styled *Cypress Financial Recoveries, LLC v. Maria Maria AKA Maria D. Acosta*, Index No. CV-006298-12/NY. **Exhibit GG** (*Maria* Complaint).

134.  According to the affidavit of service, the complaint was served on Ms. Maria on or about March 31, 2012. *Id.*

135.  These statements are false. Ms. Maria does not know anyone named Romando, and no one by that name was present in Ms. Maria's home on the day of the alleged service. Ms. Maria never received a copy of the summons and complaint in any manner. *Id.*

136.  Selip used the false affidavit of service to obtain a default judgment against Ms. Maria on February 25, 2013 when Ms. Maria inevitably failed to answer the complaint. *Id.*

137.  As in *Levy*, Selip used the notorious process serving agency CPS, which in turn used a process server named Nasser Atrash. *Id.*

138.  Nasser Atrash has been disciplined for repeatedly executing false affidavits of service and for failing to report traverse hearings to the Department of Consumer Affairs ("DCA"). On January 28, 2014, an Administrative Law Judge for the DCA found that Mr. Atrash executed false affidavits of service in five different cases since 2009. Mr. Atrash's process server's license was revoked and DCA imposed a $30,500 fine.

139.  Like Defendant Bejamin Lamb in this case, Atrash was also featured in the

Egleson Declaration from the *Sykes* case, finding that on 34 different occasions Nasser Atrash reported serving process at 2 or more locations at the same time. **Exhibit A, at p. 9.**

140.    On November 7, 2016, Maria Maria filed an FDCPA lawsuit against Selip, CPS, Atrash, and others for violations of the FDCPA and state law related to their sewer service against her.

141.    The lawsuit was settled and was dismissed on February 27, 2018.

*Watkins*

142.    Selip also used the infamous process server Atrash in a collection lawsuit it filed in 2012 captioned *Midland Funding, LLC v. Loretta Watkins*, Index Number 8375/2012. **Exhibit HH** (*Watkins* Complaint).

143.    Process server Nasser H. Atrash swore in his Affidavit of Service that he served John Watkins, a "co-tenant," with the Summons and Complaint on May 8, 2012 and later mailed a copy to Ms. Watkins. *Id.*

144.    However, Ms. Watkins never received the Summons and Complaint by mail or by any other manner, and did not know about the collection lawsuit. *Id.*

145.    In November 7, 2012, Selip used the false affidavit of service to obtain a default judgment against Ms. Watkins in the amount of $12,503.95.

146.    While the subsequent FDCPA lawsuit brought by Ms. Watkins against Selip was not for sewer service because the claim was time-barred, it nevertheless notes that "the sewer service is relevant for damages for Ms. Watkin's FDCPA claims that are not time barred: that Selip attempted to garnish her wages in 2019 after she had in fact vacated the judgment."

147.    On October 16, 2020, judgment was entered against Selip and Selip partner David Cohen for $25,000 pursuant to an Offer of Judgment.

148.  Another lawsuit was filed by Ms. Watkins in New York Supreme Court, County of Kings against Selip for its violations of state law in relation to its attempts to collect on a vacated sewer service judgment, and as of this filing is still pending.

### FIRST CAUSE OF ACTION
Violation of the FDCPA, 15 U.S.C. §§ 1629e 1692f
*Against All Defendants*

149.  The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

150.  The FDCPA, 15 U.S.C. § 1692e, prohibits a debt collector from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt."

151.  The FDCPA, 15 U.S.C. § 1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

152.  Defendants violated the FDCPA, §§ 1692e, 1692f, by using false, deceptive, and misleading representations and means and by engaging in unfair and unconscionable practices in connection with the collection of the alleged debt from Ms. Wilson.

153.  Defendants' violations include, but are not limited to:

- Failing to lawfully effectuate service of process;

- Preparing and signing a false affidavit of service;

- Filing a false affidavit of service with the court;

- Filing a false affidavit of service without meaningful attorney review;

- In bad faith, unduly prolonging legal proceedings and continuing to present the false affidavit of service as valid.

154.  Defendants' violations inflicted on Ms. Wilson economic injuries, including but not limited to out of pocket expenses for travel to an attorney's office to oppose Defendants' motion to dismiss. Defendants' violations also caused Ms. Wilson emotional distress.

155.  These are concrete and particularized injuries that have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. They are analogous to common law claims like malicious civil prosecution, abuse of process, and other wrongful litigation torts.

156.  Defendants had a duty to exercise reasonable care in the collection of debts, including in the selection of companies to attempt to collect the debt and in ensuring that the affidavit of service filed was accurate.

**<u>SECOND CAUSE OF ACTION</u>**
Violation of N.Y. Gen. Bus. L. § 349
*Against All Defendants*

157.  New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."

158.  An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). Such an individual may also be awarded punitive damages.

159.  Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using consumer-

oriented deceptive acts and practices in the conduct of their businesses.

160.  As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

### THIRD CAUSE OF ACTION
Violation of Judiciary Law § 487
*Against Selip*

161.  An attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is owes treble damages to a party injured by such deceit or collusion. Judiciary Law § 487.

162.  Selip violated Judiciary Law § 487 by filing a false affidavit of service with intent to deceive the court.

163.  Selip's conduct inflicted economic injury and emotional distress on Ms. Wilson.

### FOURTH CAUSE OF ACTION
Violation of N.Y.C. Admin. Code § 20-409.2
*Against Lamb and J&E*

164.  Under New York City Administrative Code § 20-409.2, "[a]ny person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state" has "a cause of action against such process server and process serving agency, which distributed or assigned process for service." Injured individuals may recover compensatory damages, punitive damages for willful failure to service process, injunctive and declaratory relief, costs, and attorneys' fees. *Id.*

165.  Defendants Lamb and J&E violated New York City Administrative Code

§ 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New York. Defendants' violations include but are not limited to:

- Failing to lawfully effectuate service of process; and

- Preparing, signing, notarizing, and filing a false affidavit of service.

166. Defendants' failure to serve process was willful.

167. As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiff has suffered and continue to suffer compensable harm and is entitled to recover compensatory and punitive damages, costs, and attorneys' fees.

<u>**FOURTH AND FIFTH CAUSES OF ACTION**</u>
Negligence and Gross Negligence
*Against all Defendants*

168. Defendants, as debt collectors and process servers, owed Ms. Wilson a duty of reasonable care in their debt collection efforts.

169. Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

170. Lamb actively shirked his duty of reasonable care by intentionally fabricating the affidavit of service in Ms. Wilson's case.

171. Selip is well aware of J&E's use of Lamb as a process server. Selip and J&E are both well aware of Lamb's history of sewer service.

172. Had Defendant Selip and/or J&E made even the smallest effort to review affidavits of service submitted by Lamb, they would have seen that process could not have been served in the manner Lamb alleged. They would not have filed those affidavits and/or would have ceased distributing process to him.

173. Selip could have contracted service in Ms. Wilson's case to another process

serving agency or process server, or J&E could have contracted service to another process server. Ms. Wilson would have received proper notice of the lawsuit and complete information about the claim against her.

174.  Once Selip received Ms. Wilson's motion to dismiss, it should have seen that the court lacked jurisdiction because Lamb's affidavit of service was false. It should have consented to discontinuing the lawsuit.

175.  J&E's negligent selection, hiring, training, supervising, and use of Defendant Lamb to serve process on Ms. Wilson and others was not a one-off mistake. J&E's entire practice of hiring and using of process servers is, at minimum, negligent for failing to investigate or outright ignoring the history of misconduct of the process servers. J&E's practice of notarizing and submitting affidavits of service that are false is also at minimum negligent for failing to review or ignoring affidavits of service detailing impossible attempts at service.

176.  As a result of Defendants' actions, Ms. Wilson was injured.

177.  In addition, Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing.

178.  Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

     a. A declaration that all Defendants have committed the violations of law alleged in this action;

     b. Statutory damages;

c. Reasonable attorney's fees and costs;

d. Actual damages;

e. Compensatory damages;

f. Treble damages;

g. Exemplary and punitive damages;

h. An order, pursuant to GBL 349(h) and N.Y.C. Admin. Code § 20-409.2, enjoining and directing Defendants to cease violating those statutes;

i. Prejudgment and post judgment interest as allowed by law;

j. All other relief, in law and in equity, both special and general, to which Plaintiff may be justly entitled.

## **JURY DEMAND**

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York
        May 29, 2024

Respectfully submitted,


By: _Divya Subrahmanyam, Esq._

CAMBA LEGAL SERVICES, INC.
Divya Subrahmanyam, Of Counsel
Matthew Schedler, Of Counsel
Elizabeth Miller, General Counsel
20 Snyder Ave.
Brooklyn, NY 11226
Phone: (718) 940-6311
DivyaS@camba.org

LAW OFFICE OF AHMAD KESHAVARZ
Emma Catarine, Esq.
Ahmad Keshavarz, Esq.
16 Court St., #2600
Brooklyn, NY 11241
Phone: (718) 522-7900
ahmad@NewYorkConsumerAttorney.com