UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------

| | | |
|---|---|---|
| ERIKA WILSON, | : | |
| Plaintiff, | : | Case No.: 1:24-cv-4108-ALC |
| | : | |
| – against – | : | **FIRST-AMENDED** |
| | : | **COMPLAINT** |
| SELIP & STYLIANOU, LLP; J & E PROCESS | : | **AND** |
| SERVERS; and BENJAMIN LAMB. | : | **JURY DEMAND** |
| Defendants. | : | |

--------------------------------------------------------------------
                                                                    X

## **PRELIMINARY STATEMENT**

1.      Plaintiff Erika Wilson brings this action against Defendants Selip & Stylianou,

LLP, J&E Process Servers, Inc, and Benjamin Lamb for their violations of the Fair Debt

Collection Practices Act, 15 U.S.C. § 1692 et seq. and New York General Business Law § 349 et

seq.; for Lamb and J&E's violations of N.Y.C. Admin. Code § 20-409.2; and for Selip's

violations of New York Judiciary Law § 487 et seq and for common law claims.

2.      In May 2023, Defendant Selip & Stylianou, LLP, ("Selip") as counsel for an

original creditor filed suit (the "collection lawsuit") against Erika Wilson ("Ms. Wilson") in

Bronx County Civil Court. Selip contracted J&E Process Servers ("J&E") for the purpose of

executing an affidavit of service in this civil court action. In turn, J&E contracted process server

Benjamin Lamb ("Lamb").  Lamb is a notorious perpetrator of sewer service who had been sued

15 years earlier for falsifying affidavits of service and claiming service attempts that were

impossible, like service at two addresses at the exact same time. Selip knew that J&E regularly

contracted Lamb to effect service because it had been doing so for many years.

1

3.    Lamb submitted an affidavit of service claiming to have served Ms. Wilson's co-tenant, which J&E notarized and, at Selip's direction, filed with the court. The affidavit of service also falsely claimed that a copy of the summons and complaint was mailed to Ms. Wilson. On the same day, Lamb also submitted to J&E multiple affidavits of service in other cases that reflected physically impossible attempts at service.

4.    Lamb's affidavit of service in Ms. Wilson's case was false: on the day of alleged service, June 8, 2023, Ms. Wilson and her mother (the only other person who lived with her) were at Mount Sinai West watching over Ms. Wilson's two-day-old daughter, who was hospitalized in the Neonatal Intensive Care Unit. Neither of them received the summons and complaint in any manner.

5.    Because of the active concealment of Defendants, Ms. Wilson did not learn about the case against her until late July, when she received a bare-bones, one-page notice informing her that she had been sued. *See* **Exhibit II** (the "Notice Form"). The Notice Form was the "Additional Notice of a Lawsuit" required under New York CPLR 306-d to be sent out by the county clerk's office after a plaintiff files an affidavit of service.

6.  The Notice Form did not provide critical information contained in the Summons and Complaint that Defendants fraudulently concealed from Ms. Wilson.  The Notice Form fails to provide Ms. Wilson with the specific allegations against her and necessary information about her case. For example, although the notice informed Ms. Wilson that she had been sued for a consumer debt, it did not specify the amount of the debt, the claims asserted, or the allegations supporting those claims.  The notice informed Ms. Wilson that she "may wish to consult an attorney" and that she should file an answer as soon as possible so that the Plaintiff did not obtain a default judgment against her, but did not specify when or how the Plaintiff claimed to

have already served her.  Unlike a Summons and Complaint which must specify that an answer must be filed within 20 days, this notice does not specify the time remaining, if any, for the defendant to answer, and simply directs them to respond "as soon as possible." Indeed, the time to answer had already passed by the time Ms. Wilson received the Notice Form.  22 NYCRR § 208.6.

7.    Lamb claims to have served Ms. Wilson on June 8, 2023, and J&E filed the affidavit of service on June 21, 2024, so Ms. Wilson had 30 days from June 21, 2023 to file an answer. New York Civil Court Act § 402.

8.    At the time, Ms. Wilson was home with her newborn daughter, who had been discharged from the hospital a few weeks earlier. The notice alarmed Ms. Wilson; not only was she being sued, but this notice from the court indicated that the lawsuit had already proceeded without her knowledge. She did not know the most pertinent details of the case, and she did not know how much time, if any, she had left to act before she was deprived of her property as the notice warned. The notice caused Ms. Wilson to become anxious and have trouble sleeping, on top of the stress and sleep deprivation she was experiencing as a new mother and her worry about her daughter's health. This emotional distress was different and greater than if she were sued for a putative debt and was provided all of the information contained in the summons and complaint.

9.    Panicked and distressed, Ms. Wilson was ultimately able to obtain representation from a legal services organization, CAMBA Legal Services, and spent time and incurred travel expenses to do so.

10.    After filing an answer, Ms. Wilson worked with her lawyer to file a motion to dismiss the case on the ground that she was never served and the court lacked jurisdiction. Ms.

Wilson again expended time and money to travel to and from CAMBA's offices, to sign an affidavit in support of a motion to dismiss the case for failure to serve. Ms. Wilson suffered monetary damages of lost time and transportation expenses incurred solely to fight the misconduct of the execution and filing of the false affidavit of service.

11.    Yet Selip, even though it now had been put on notice by Ms. Wilson that the affidavit in Ms. Wilson's case was false (as were other affidavits of service from that day), refused to discontinue the case. It instead opposed Ms. Wilson's motion. The court ultimately set the matter down for an evidentiary hearing to determine whether service was proper.

12.    Ms. Wilson now seeks to hold Defendants accountable for their conduct.

## JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction under 15 U.S.C. § 1692k(d), which provides that civil actions for violations of the Fair Debt Collection Practices Act may be brought in any appropriate United States district court without regard to the amount in controversy.

14. This Court has supplemental jurisdiction over Ms. Wilson's state law claims because they are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *See* 28 U.S.C. § 1367(a).

15. Declaratory relief is available under 28 U.S.C.  §§ 2201(a) and 2202.

16. Venue is proper under 28 U.S.C. 1391 because all or a substantial part of the events or omissions giving rise to Ms. Wilson's claims occurred in this district. Specifically, Plaintiff sued Ms. Wilson and purported to serve her with process in Bronx County.

## THE PARTIES

17.    Plaintiff Erika Wilson is a natural person residing in Bronx County, New York.

18.    Ms. Wilson is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3)(5), in that she was allegedly obligated to pay a debt arising out of a transaction in which the subject money was primarily for personal, family, or household purposes—in this case a "CareCredit-branded revolving credit account."

19.    Defendant Selip & Stylianou LLP is a law firm and registered limited liability partnership organized under the laws of the State of New York. Its principal place of business is 199 Crossways Park Drive, PO Box 9004, Woodbury, NY 11797. Selip is a debt collection law firm and is registered as a debt collection agency with DCWP, license number 2045186-DCA.

20.    Selip regularly collects on consumer debts owed or due another by sending thousands of collection letters, filing thousands of collection lawsuits, and collecting on judgments by using information subpoenas, bank restraints, and income executions. The collection of consumer debts is the principal purpose of Selip's business. Selip is therefore a "debt collector" as defined in 15 U.S.C. § 1692a(6).

21.    Defendant J & E Process Services, Inc., is a corporation organized under the laws of the State of New York with its principal place of business located at 901 N. Broadway, White Plains, NY 10603. It is registered as a process serving agency with the New York City Department of Consumer and Worker Protection ("DCWP," formerly known as the New York City Department of Consumer Affairs, or "DCA"). Its license number is 2027471-DCA. J&E is a division of Inter County Judicial Services, LLC ("Inter County"), a limited liability corporation organized under the laws of the State of New York. It is registered as a process serving agency with DCWP, license number 1371771-DCA, under the same business address as J&E—901 N. Broadway, White Plains, NY 10603. J&E's operations are intertwined with Inter

County's: in addition to sharing a physical office, they share employees and a business website, www.intercountyjudicial.com.

22.   J&E regularly fails to serve summons and complaints, and regularly executes and submits false affidavits of service allowing the entry of default judgments against putative consumers to collect putative consumer debts. J&E is therefore a debt collector within the meaning of 15 U.S.C. § 1692a(6).

23.   Defendant Benjamin Lamb is a natural person who serves process for J&E Process Servers. He is registered as an individual process server with DCWP, license number 1071492-DCA. He executed a false affidavit of service claiming he served the collection lawsuit on Ms. Wilson. Lamb has a documented history of falsifying affidavits of service and of claiming to have served people he never served.

24.   Lamb regularly fails to serve summons and complaints and regularly executes false affidavits of service allowing debt collectors, including Selip, to ultimately enter default judgments against consumers who are never served and never appear in the case against them. Lamb is therefore a debt collector as defined by 15 U.S.C. § 1692a(6).

25.   At all times described in this Complaint, Lamb was acting in the scope of his employment or contract with J&E.

## STATUTORY AND REGULATORY FRAMEWORK

26.   To commence a lawsuit against a natural person in New York, a plaintiff must serve the summons and complaint on the defendant by one of three methods: personal service, substitute service, or nail and mail service.

27.   Personal service is personal delivery of the summons and complaint. CPLR § 308(1).

28.    "Substitute service" requires delivery in person on "a person of suitable age and discretion at the actual place of business, dwelling place or usual place of abode of the person to be served," and mailing the summons and complaint to the last known residence or actual place of business of the person to be served. *Id.* § 308(2).

29.    Finally, if with due diligence the person cannot be served by personal service or substitute service, they may be served by "nail and mail" service: "affixing the summons [and complaint] to the door of either the actual place of business, dwelling place or usual place of abode within the state of the person to be served," and mailing the summons and complaint to the last known residence or actual place of business. *Id*. § 308(4).

30.    An affidavit of service must then be filed with the court. When service is made by substitute service, the affidavit must "identify" the individual who was served; include "a description of the person [served], including, but not limited to, sex, color of skin, hair color, approximate age, approximate weight and height, and other identifying features"; and "state the date, time and place of service." *Id.* §§ 306(a-b), 308(2).

31.    If a defendant fails to appear or submit an answer, the plaintiff may file an application for a default judgment against that defendant. *Id*. § 3215(a). This application must include a copy of the affidavit of service. *Id*. § 3214(f).  A default judgment may then be administratively entered by the clerk of court. *Id*.§ 3215(a).

32.    A debt collector who obtains a judgment against a consumer may execute on that judgment by garnishing the consumer's wages or levying their bank accounts, with no judicial approval required, for the next twenty years. *Id*. §§ 211(b), 5231, 5232.

33.    However, a New York court lacks personal jurisdiction over any individual who was not lawfully served with process, and such an individual may move to dismiss an action, or

vacate a judgment, on this basis. *See* N.Y. C.P.L.R. §§ 3211(8), 5015(a)(4). A court faced with such a motion may dismiss the action outright or may set the matter down for an evidentiary hearing, called a traverse hearing, to determine whether service was proper.

34.    All process servers and process serving agencies must be licensed by the New York City Department of Consumer and Worker Protection (DCWP) and must follow rules and regulations issued by the City. N.Y.C. Admin. Code § 20-403 et seq.

35.    All New York City process servers must maintain electronic or paper logbooks in which they record information about all instances of service and attempted service in a prescribed format. N.Y. G.B.L. § 89-cc. Each entry must contain, among other information, the title, court, and index number of the action; the type of service attempted and/or effected; the name and physical description of the person served; the date, time, and address when service was effected. *Id.* § 89-cc(2); 6 RCNY § 2-233(a,b). When service is effected by nail and mail, the record must include a description of the door where the papers were posted and the adjacent area, including the color and composition of hallway walls, floor, and doorstep, and the location of the premises in relation to the stairs, elevator, or entranceway. *Id.* § 2-233(a)(2)(xvi).

36.    Process servers and agencies may not "sign or notarize or cause to be signed or notarized an affidavit of service until all factual averments have been set forth" and they may "not make a false statement in an affidavit of service." *Id*. § 2-235.

37.    All New York City process servers must maintain GPS records of their location at all times while carrying out their process serving duties. N.Y.C. Admin. Code § 20-410.

38.    All New York City process serving agencies must "be legally responsible for any failure to act in accordance with the laws and rules governing service of process by each process server to whom it has distributed, assigned or delivered process for service." N.Y.C. Admin.

Code § 20-406.2(b). They must conduct monthly reviews of the records of each individual process server to whom they distribute process. RCNY § 2-234a(b)(2)(i)-(ii). Process serving agencies must not distribute process to any process server who "does not display integrity and honesty in his or her process serving activities" or who otherwise does not comply with the applicable rules. RCNY § 2-234a(a). The agency must also take disciplinary action against any individual process server who fails to comply with the law. *Id.* § 2-234a(b).

39.    DCWP may file disciplinary charges against process servers and agencies who fail to comply with the applicable laws and rules.

## FACTS

### *Lamb's History of Sewer Service and Falsifying Affidavits of Service*

40.    Defendant Lamb has a long history of sewer service—i.e., intentionally failing to serve process—and of falsifying affidavits of service.

41.    He was a defendant and key malefactor in *Sykes v. Mel S. Harris, et al.*, a federal class action targeting a massive, illegal debt collection scheme by debt collectors, debt collection law firms, and process servers. A crucial feature of that scheme was Lamb and the other process server defendants' pattern of failing to serve process but swearing in court-filed affidavits of service that they had. This practice ensured that consumers were never notified of the lawsuits against them, which enabled the debt collectors to easily obtain default judgments.

42.    In the 2012 decision granting class certification in *Sykes*, the district court found that Lamb consistently lied about the service he was supposed to perform and repeatedly claimed to be serving multiple individuals at the exact same time. *Sykes v. Mel Harris & Assocs., LLC*, 285 F.R.D. 279, 284 (S.D.N.Y. 2012), aff'd sub nom. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70 (2d Cir. 2015). On many other occasions, Lamb's purported attempts

9

at service were "so close in time that it would have been impossible for [him] to travel from one location to the other as claimed." *Id*.

43. The court's findings of fact were based on the expert declaration of an IT consultant, Nicholas Egleson, which provided further detail than was included in the court's decision. *Id*. Egleson based his declaration testimony on his comprehensive analysis of all service of process performed by Lamb's former agency (one of the defendants in *Sykes*) from January 2007 through January 2011. Exhibit A (Egleson Declaration). This included over 16,000 affidavits of service completed by Lamb.

44. Egleson reported that on 66 occasions Lamb outright lied, claiming to have served process in two separate locations at the exact same time—an impossibility. *Id*.

45. Lamb also reported physically impossible travel times and nonsensical routes. *Id*. at ¶¶ 13, 16.) For example, "on December 8, 2008, while serving defendants in the Bronx, Defendant Lamb reported having completed 12 hours and 15 minutes of travel in seven hours and 10 minutes. On that day alone, Defendant Lamb consistently backtracked among zip codes and reported 10 instances when he was in two different locations at the exact same time." *Id*. ¶ 19.

46. As part of his pattern of improper service, Lamb would almost always allege that he had performed substitute service.

47. In at least 15,000 of the Lamb affidavits inspected by Egleson, or 91.2 percent, Lamb alleged substitute service. In comparison, Lamb allegedly only completed personal service 5.41 percent of the time and only completed nail and mail service .03 percent of the time.

48. Also in 2012, the Department of Consumer Affairs brought disciplinary charges

against Lamb. He resolved the charges by signing a Consent Order agreeing to pay a fine of $500 and agreeing to follow all the Department's rules and regulations. **Exhibit B** (2012 Consent Order).

49.    On August 7, 2013, Lamb appeared for a traverse hearing in Bronx County Civil Court in *Palisades Collection v. Teresa Smith*, CV-020105-06/BX to testify about an affidavit of service he executed regarding purported service in 2006. At that hearing, he was "confronted with information showing that on two occasions he served two people at the same time" and claimed those were mere typographical errors. On November 3, 2013, the court found Lamb's testimony "totally unbelievable," concluded the defendant was never served, and vacated the judgment. **Exhibit C** (Smith Traverse Decision).

50.    Since 2013, numerous traverse hearings have been held regarding Lamb's affidavits of service, and traverse has repeatedly been sustained and service found to have been improper. Often, this finding has been based on Lamb's failure to appear at the hearing or his failure to produce his logbook or GPS records. **Exhibit D** (Traverse Reports).

51.    In January 2020, DCA served Lamb with an order to produce his logbooks for October 2018 through September 2019, and other documents relating to his process serving activities, then followed up with a reminder in February 2020. When Lamb failed to produce the required documents, DCA on or around March 3, 2020, suspended his license pending compliance with the order. **Exhibit E** (2020 Lamb Suspension).

52.    In February 2020, DCA issued a summons to Lamb for failing to report the scheduling of two traverse hearings in October 2019 regarding service in 2018, and directed him to appear at an administrative hearing. This summons was later withdrawn. **Exhibit F** (DCA Summons 200020HR and Notice of Withdrawal).

53.    On September 17, 2020, a default decision was issued against Lamb relating to a different summons, No. 2000002CS, and those allegations—of violating 6 RCNY § 1-13—were deemed admitted and he was fined $500. Exhibit G (September 2020 Default Decision).

54.    In June 2022, DCA served a subpoena on Lamb seeking his process serving records from March 2022, which Lamb complied with. Based on those documents, in November 2022, DCA issued yet another summons to Lamb, charging him with various violations of the rules governing process servers. Specifically, in March 2022 alone, Lamb: 1) claimed in an affidavit of service that he made service on March 23, 2022 at 11:17, while his GPS records only showed he was in that location on March 22, 2022 at 11:20 a.m.; 2) for one case, did not identify in his logbook the nature of the papers served; and 3) did not include his license number on three affidavits of service. **Exhibit H** (2022 DCA Summons).

55.    In a consent order signed and dated March 2, 2023, Lamb pled guilty to three of the four counts, agreeing to pay a fine of $1,125 upon execution of the consent order and to follow the rules governing process servers going forward. **Exhibit I** (2023 Consent Order).

56.    But Lamb did not pay his fine, as he had promised to do, and DCA suspended his license on May 23, 2023, for his failure to pay. Exhibit J (2023 Lamb Suspension). The following day, Inter County Judicial Services LLC paid Lamb's fine. Exhibit K (Payment Receipt).

57.    It would be impossible for Selip to employ Lamb's services as a process server as frequently as it has without becoming aware of his blatant patterns of fraudulent service. When a law firm employs the services of a process server, they do not become disengaged from the question of when, where, and how the documents are served. An affidavit of service for a summons and complaint initiating a case is not simply a ministerial document, but central to the

prosecution of any lawsuit because service establishes personal jurisdiction. A law firm cannot proceed with a case until service of a summons and complaint has been affected. A lawyer prosecuting a lawsuit must examine an affidavit of service to determine when an answer should be expected by and if and when a proposed default judgment can be filed. Indeed, the date of service determines the trajectory of the case, and the affidavit of service becomes an exhibit in future filings. Selip cannot claim to have effectively prosecuted any of the thousands of cases they employed Lamb's services on and to be ignorant of the fraudulent contents of the affidavits of service or the implausible and impossible patterns of service they present.

58.    Nevertheless, Lamb continued to work as a process server, including for J&E, and served process on cases for Selip & Stylianou, throughout 2023.

## Defendants Falsely Claim to Have Served Ms. Wilson and to Have Mailed Duplicate Copies

59.    Erika Wilson is a 34-year-old resident of Bronx County, New York. She lives at 3540 Decatur Ave., Apt. 1G, Bronx, NY 10467 with her mother, Shemin Wilson, and her one-year-old daughter, R. Ms. Wilson and her mother have lived at that address for nearly 12 years. Although Ms. Wilson used to work as an elementary school teacher, she now cares for her daughter full-time.

60.    On May 30, 2023, Synchrony Bank, through its counsel Selip, purchased an index number for a suit against Ms. Wilson in Bronx County Civil Court. A true and correct copy of the Summons and Complaint are attached as Exhibit L. The summons was labeled as a "Consumer Credit Transaction," and the Complaint alleged that Ms. Wilson had opened a CareCredit branded credit card with Plaintiff, incurred a balance, and ultimately defaulted. The

Summons and Complaint was signed by Donna A. Ciampa, Esq., on behalf of Selip.

61.     Selip then contracted J&E, and, in turn, J&E contracted Lamb, for the purposes of executing an affidavit of service in this legal matter. Selip chose to employ J&E as a process server less than a month after Inter County, J&E's parent company, paid Lamb's fine for his multiple violations of the rules governing process servers.

62.     On June 21, 2023, J&E, acting as agent of Selip, filed an affidavit of service in the case via the New York state court system's Electronic Document Delivery System (EDDS). A true and correct copy of the affidavit of service is attached as Exhibit M. A true and correct copy of the EDDS Notification of Receipt, provided by Selip as an exhibit in the civil court case, is attached as Exhibit N.

63.     On information and belief, Selip directed J&E to file the affidavit of service via EDDS. It is unclear who at J&E filed the affidavit of service: the Notification of Receipt states the documents were sent by "Ellen Eakley," but the email address provided for the sender was dawn@jeprocess.com and the Notification was sent to "Dawn Diforio." In any case, an agent(s) of J&E filed the affidavit of service in Synchrony Bank v. Erika N. Wilson.

64.     The affidavit of service was executed by Defendant Lamb on behalf of "J and E Process Service, Inc." Exhibit M. It was purportedly signed and notarized on June 16, 2023 before Melissa A. Cyran, identified as a notary public qualified in Westchester County. *Id.*

65.     On information and belief, Melissa A. Cyran is an employee of and/or performs work for both J&E and Inter County.

66.     In the affidavit of service, Lamb swore that he served the summons and complaint on June 8, 2023, at 3:16 p.m. on Ms. Wilson's alleged co-tenant, "Chante Wilson" at 3540 Decatur Ave., Apt. 1G, Bronx, NY 10467. "Chante Wilson," Lamb claimed, was a Black

woman with black hair, exactly 25-years-old, standing 5'4" to 5'6" tall, and weighing 131-160 pounds. (Ex. B.) He alleged that he asked "Chante Wilson" whether the defendant "was in the active military service of the United States or the State of New York in any capacity whatever" and received a negative reply. *Id.*

67.    Lamb further alleged that he mailed a copy of the summons and complaint to Ms. Wilson at the same address on June 16, 2023.

68.    But Ms. Wilson did not receive the summons and complaint, and every single statement in Mr. Lamb's affidavit of service was false.

69.    On June 8, 2023, the only people who lived at 3450 Decatur Ave., Apt. 1G, were Ms. Erika Wilson and her mother, Shemin Wilson.

70.    No person named Chante Wilson lived at 3450 Decatur Ave., Apt. 1G in June 2023 or ever, and there is no person by that name in Ms. Wilson's family. No person matching Chante Wilson's description has ever even been in Ms. Wilson's apartment.

71.    In fact, no one would have been home at Ms. Wilson's apartment on June 8, 2023, at 3:16 p.m. because both Ms. Wilson and her mother were at Mount Sinai West Hospital where Ms. Wilson's daughter, R, had just been born and was in the neonatal intensive care unit (NICU).

72.    R was born on June 6, 2023, with fluid in her lungs and was immediately admitted to the NICU. On R's third day in the NICU, hospital staff determined R had infant jaundice and needed to stay another day to receive phototherapy treatment. R was discharged on June 10, 2023.

73.    Ms. Wilson stayed with R during her entire stay in the NICU and did not leave until R was discharged. Shemin Wilson stayed with Ms. Wilson and R for the entirety of

15

visiting hours each day of R's stay, from 10 a.m. through 9 p.m., including on June 8, 2023, at

3:16 p.m. when Lamb alleged service.

74. On the day of alleged service, no one would have been home at 3450 Decatur

Ave., Apt. 1G at 3:16 p.m. or at any time between 10 a.m. and 9 p.m.

75. Ms. Wilson was never served and Lamb lied in his affidavit of service, just as he

has countless times over the last two decades. This was not an isolated occurrence.

### Lamb's Current Systematic Sewer Service for J&E and for Selip

#### *Impossible or Implausible Service Times in Affidavits Filed Contemporaneously with Wilson Affidavit*

76. In addition to the public records evidencing Lamb's long history of sewer service

and falsified affidavits of service, Ms. Wilson's counsel uncovered additional examples of

plainly impossible claims to service.

77. In preparation for the motion to dismiss in Ms. Wilson's case. Matthew Schedler,

an attorney with CAMBA Legal Services, Inc., reviewed and copied 39 affidavits of service

from all the index numbers surrounding the index number for the civil court action against Ms.

Wilson in which an affidavit of service was in the file (CV-5340-23/BX through CV-5394-

23/BX). Exhibit O (39 Sequential Affidavits of Service). These 39 affidavits of service were all

executed by Lamb for J&E, in cases brought by Selip as counsel for a creditor. All 39 affidavits

of service were notarized by Melissa A. Cyran and were filed on EDDS.

78. All 39 affidavits of service claim substitute service. 34 out of 39 affidavits of

service provide the name of the person served, and all state that the person served "gave a

negative reply" when asked whether the defendant had served in the military.

79. The affidavits of service contain impossible claims to service. Earlier on the same

day that Lamb claimed he served "Chante Wilson," Lamb also allegedly completed substitute service at 640 Adee Ave., Apt. 13G, Bronx, NY, at 2:40 p.m., followed by substitute service at 2304 Matthews Ave., Apt. 1, Bronx, NY 10476 at 2:49 p.m. Ex. O, pp. 59-60. Both affidavits of service were notarized by Melissa Cyran on June 16, 2023.

80.     According to Google Maps, the driving distance between the latter two locations is at least six minutes by car.

81.     According to Google Maps, 640 Adee Ave. appears to be a 15-story apartment building with multiple units on each floor. The building is set back from the road and is up a small hill. **Exhibit P** (Google Maps Street View Printout of 640 Adee Ave.).

82.     According to Google Maps, 2304 Matthews Ave is a freestanding, multi-story private home in which the front door is up a flight of stairs. The home is surrounded by a metal gate. **Exhibit Q** (Google Maps Street View Printout of 2304 Matthews Ave.).

83.     To complete service at 2304 Matthews Ave., nine minutes after he completed service at 640 Adee Ave., Apt. 13G, Lamb would have had to walk to the elevator from the unit, descend from the 13th floor to the ground floor of Adee Ave., walk out to the road, walk to wherever he parked his vehicle, note down the description of the person served and the information concerning service (either in his logbook or in some other form to preserve his recollection to submit electronically), drive the minimum six minutes to 2304 Matthews, or more with traffic, find the address, find parking, park his car, gather the papers to be served, walk to 2304 Matthews, enter the gate, climb the front stairs, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether the defendant had been in the military, and then hand them the summons and complaint.

84.     On information and belief, it would be impossible to do all that in nine minutes.

17

85.    Later that month, Lamb again claimed, impossibly, to have served two individuals in just 10 minutes. He claimed that on June 17, 2023, at 3:54 p.m., he served an individual by substitute service at 4356 Grace Ave., Bronx, NY 10466. Then, at 4:04 p.m., he allegedly again performed substitute service at 4:04 p.m. at 3916 Harper Ave., Apt. 9, Bronx, NY 10455. Both affidavits of service were notarized by Melissa Cyran on June 26, 2023 and filed on EDDS.

86.    According to Google Maps, the driving distance between 4356 Grace Ave. and 3916 Harper Ave. is six minutes.

87.    According to Google Maps, 4356 Grace Avenue appears to be a small two-story home with a gate around the front yard and steps leading up to the door. Exhibit R (Google Maps Street View Printout of 4356 Grace Ave.). 3916 Harper Ave. appears to be part of an adjoining set of multilevel apartments set back from the road. Exhibit S (Google Maps Street View Printout of 3916 Harper Ave). There are 7 doors visible from the street, each labeled with a different street address, e.g. "3916," or "3914." There is no lobby or doorman, and individual apartment numbers (e.g. "9") are not visible from the outside. To get to "3916," a visitor would have to climb two flights of stairs.

88.    To complete service at 3916 Harper Ave. 10 minutes after completing service at 4356 Grace Ave., Lamb would have had to descend the steps at Grace Ave., open the gate, walk to and enter his vehicle, memorialize the details of service, drive the minimum six minutes to 3916 Harper Avenue or more with traffic, find parking, park his car, gather the papers to be served, figure out which door to knock on, ascend the stairs, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, then finally hand them the summons and complaint.

89.    On information and belief, it would be impossible to do all that in ten minutes.

90.    In addition to these impossible descriptions of service, the 39 affidavits pulled on Ms. Wilson's behalf show that Lamb never claimed personal service on a defendant and never claimed affix and mail service. In other words, Lamb claims to have knocked on the doors of 39 homes, and that each time, no one was home—instead, a third party answered the door, told that stranger at the door that the defendant was not in the military, and then accepted service. This is implausible and does not survive scrutiny.

91.    Alleging substitute service allows Mr. Lamb to avoid scrutiny of his false affidavits of service. This would not be possible if he were to falsify attempts at personal service because an inaccurate, fabricated description of the defendant could be easily countered by the defendant's actual physical appearance. And if Lamb falsely alleged affix and mail service, he would have to make required GPS recordings and describe the physical appearance of the door and adjacent area, both of which can be easily verified. Substitute service cannot be so objectively rebutted, because it requires the defendant to prove a negative—that no person matching the description in the affidavit of service would have been at the residence at the time of service. On information and belief, Lamb regularly falsifies his affidavits of service.

92.    To further confirm Selip, J&E, and Lamb's pattern and practice of falsifying affidavits of service, Ms. Wilson's counsel also examined a sample of affidavits of service in cases filed by Selip in two other randomly selected time periods, early 2023 and late 2021. See **Exhibit T** (2022 Lamb Affidavits), **Exhibit W** (Additional 2023 Lamb Affidavits). Many of these cases were contracted to J&E, for the purpose of obtaining an executed affidavit of service, who in turn contracted many of this subset to Lamb.

93.    Unsurprisingly, Lamb's affidavits of service in these cases also contained multiple examples of impossible attempts at service and clearly falsified affidavits. And the vast

majority alleged substitute service.

94.    On January 5, 2022, Lamb claimed to have completed substitute service at 4160 Hutchinson River Parkway E, Apt. 3A, Bronx, NY, at 4:22 p.m., followed by substitute service at 140 Erdman Place, Apt. 2F, Bronx, NY just four minutes later at 4:26 p.m. Exhibit T, pp. 14-15. Both these affidavits of service were notarized by Melissa Cyran on the same day and filed by J&E via EDDS.

95.    According to Google Maps, the driving distance between these two addresses is 6 minutes. Lamb could not have effected service at these addresses just 4 minutes apart.

96.    On January 25, 2022, Lamb claimed to have served someone at 100 Erskine Place,

97.    Apt. 9F at 12:09 p.m. and someone else at 100 Donizetti Place, Apt. 25G at 12:26 p.m. **Exhibit T**, pp. 25-26. Both these affidavits of service were notarized by Melissa Cyran on the same day and filed by J&E via EDDS.

98.    According to Google Maps (Exhibit U and Exhibit V), both of these addresses are high-rise apartment buildings, and the driving distance between these two addresses is 10-12 minutes. In just 17 minutes, Lamb could not have descended 9 floors at 100 Erskine Place, walked to and entered his vehicle, memorialized service, driven 10-12 minutes to 100 Donizetti Place, found parking, parked his car, gathered the papers to be served, gained access to the building, ascended 25 floors, figured out which unit was 25G, knocked on the door, waited for someone to answer the door, asked that person their name, asked that person whether they had been in the military, then finally handed them the summons and complaint.

99.    On January 31, 2023 Lamb swears that he completed substitute service at 1:21 P.M. at 1233 Arnow Avenue, Bronx, NY 10469.  Lamb then swears that he performed

substitute services three minutes later at 2523 Paulding Avenue, Apt. 1F, Bronx, New York 10469. **Exhibit W**, pp. 7-8. Both affidavits of service were notarized by Melissa Cyran on February 7, 2023, and submitted on EDDS.

100.  According to Google Maps, the driving distance between these two locations is three minutes.

101.  To complete service at 2523 Paulding Avenue, three minutes after he completed service at 1233 Arnow Ave., Lamb would have had to exit Arnow Ave., walk to his vehicle, fill out the description of the person served and the information concerning service in his logbook, drive the minimum three minutes or more with traffic, find the next address, find parking, park his car, gather the papers to be served, ring the buzzer, wait for someone to answer the buzzer, go to the door, knock, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, and then hand them the summons and complaint.

102.  On information and belief, it would be impossible to do all that in three minutes.

103.  The next day on February 1, 2023 Lamb again claimed, impossibly, to have served two individuals in just five minutes. He claimed that on February 1, 2023, at 1:29 p.m., he served an individual by substitute service at 2612 Chesbrough Avenue, Apt. 2, Bronx, NY 10461. Then, at 1:34 p.m., he allegedly again performed substitute service at 2437 Lyvere Street, Apt. 1J, Bronx, NY 10461. Both affidavits of service were notarized by Melissa Cyran on February 7, 2023, and filed on EDDS.

104.  According to Google Maps, the driving distance between 2612 Chesbrough Avenue and 2437 Lyvere Street is 7 minutes. 2612 Chesbrough Avenue is a small multifamily home with steps leading up to the door. Exhibit X (Google Maps Street View Printout of 2612 Chesbrough Avenue). 2437 Lyvere Street is a large apartment building with many units.

21

**Exhibit Y** (Google Maps Street View Printout of 2437 Lyvere).

105. To complete service at 2437 Lyvere Street 5 minutes after completing service at

106. 2612 Chesbrough Avenue., Lamb would have had to descend the steps at Chesbrough., walk to and enter his vehicle, fill out the description of the person served and the information concerning service in his logbook, drive the 7 minutes to 2437 Lyvere Street, find parking, park his car, gather the papers to be served, gain access to the building, find and walk to the apartment, knock on the door, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, then finally hand them the summons and complaint. Upon information and belief it would be impossible to perform service and drive the 7 minutes between locations in 5 minutes.

107. Lamb again alleges impossible service on February 6, 2023. On this date he claims he performed substitute service at 867 Kinsella Street Bronx, NY 10462 at 1:22 p.m. and then again performed substitute service 6 minutes later at 1: 28 p.m. at 759 Van Nest Avenue, Bronx, NY 10462. **Exhibit W**, pp. 34-35. Both affidavits of service were notarized by Melissa Cyran on February 8, 2023, and filed on EDDS.

108. According to Google Maps, the driving distance between these two locations is eight minutes.

109. Upon information and belief, 867 Kinsella Street and 759 Van Nest Avenue are both small multifamily homes. **Exhibits Z** and **AA**. The residence at 759 Van Nest has a large set of stairs to the front door. To complete service at 759 Van Nest Avenue 6 minutes after he completed service at 867 Kinsella Street, Lamb would have had to walk to his vehicle, fill out the description of the person served and the information concerning service in his logbook, drive the minimum 8 minutes to or more with traffic, find the address, find parking, park his car,

gather the papers to be served, drive to 759 Van Nest, climb the stairs to the door, wait for someone to answer the door, ask that person their name, ask that person whether they had been in the military, and then hand them the summons and complaint.

110.  Upon information and belief, it would be impossible to perform service and travel the eight minutes between locations in six minutes.

### *Records of Impossible and Implausible Service in Lamb's 2023 Logbook*

111.  As part of preparation for a traverse hearing in a different action, CAMBA Legal Services subpoenaed Lamb's logbook for the period of January 2023 through December 2024 from the company that maintains Lamb's process serving records, PS Compliance, LLC. Only records between January 2023 and November 2023 were available because, upon information and belief, Lamb switched to a different electronic records storage vendor. **Exhibit NN** (subpoenaed 2023 Lamb electronic logbook)

112.  These subpoenaed records show a blatant systemic continuation of the unlawful and illegal practices that Lamb had already been sued and disciplined for.

113.  The logbook is filled with service attempts at times and between locations that are not possible. Most striking are the instances where Lamb claims to be serving two separate locations at the exact same time. As he was shown to do in *Sykes*, Lamb claimed to perform service in multiple locations at the exact same time at least 11 times. Selip represented the plaintiff and J&E was the agency responsible for serving the Summons and Complaint in four of these instances. This means that there were at least four separate occasions where Selip received Lamb affidavits showing he was serving process at the exact same time at different locations and did not do anything about it. In all but two of these 11 instances, Lamb was working for either J&E or Inter County Process Servers. **Exhibit OO** (Table showing duplication service).

114.  The facts are striking. For example, on June 12, 2023, at 8:02pm, Lamb claims to have simultaneously effected substitute service of a Summons and Complaint in two different cases at two different addresses located over 3 miles apart. Selip represented the Plaintiff in one of these cases and had contracted J&E as the process server (see *Synchrony Bank v. Diane Bows*, CV-05375-23/BX).

115.  On July 1, 2023, at 5:51pm, Lamb claims to have effected substitute service of a summons and complaint for two different cases at addresses 6 miles apart (see *TD Bank USA, N.A. v. Antonia Machado*, CV-006017-23/BX, see also *Synchrony Bank v. Dacia West*, CV-006034-23/BX). In both cases, Lamb claimed to have served the exact same person, "Eric Serrano," with the exact same physical description at the exact same time.  Selip represented the Plaintiffs in both of these cases and contracted J&E for both. So Selip and J&E received affidavits of service for two different cases claiming to serve papers on the same person at two different locations at the exact same time, yet notarized and filed them anyway. Selip and J&E continued to do business with Lamb.

116.  On July 26, 2023, Lamb claims to have somehow have effected substitute service of a summons and complaint in three different cases, on three different people, at three different addresses within a span of just four minutes. One of the three cases, *Citibank, N.A. v. Miguelina Maria*, CV-05382-23/BX, appears to be logged twice, at 18:01 and at 18:05 time stamps. However, Lamb also claims to have effected substitute service in two other cases at both 18:01 and 18:05. At 18:01, he claims to have served a "John Doe" the summons and complaint in *Citibank, N.A. v. Nizamudeen Rampersaud*, CV-07025-23/BX, at an address nearly half a mile away. At 18:05, he claims to be back at the first address , from the *Miguelina* case, while simultaneously serving a summons and complaint in *Citibank, N.A. v. Lisa Travieso*, CV-

24

07007-23/BX, at a third address nearly one-half and one mile away from the other two addresses, respectively. Selip represented Citibank and contracted J&E for all three of these cases, making it readily apparent to both Selip and J&E that service was physically impossible, and therefore improper, in all three cases.

117.  On October 3, 2023, Lamb claims to have effected substitute service in two different cases at two different addresses at the exact same time (see *TD Bank USA, N.A. v. Christopher Atherley*, CV-009904-23/BX, see also *Capital One, N.A. v. Dairy Y Recinos*, CV-09949-23/BX). The two addresses are 0.8 miles and at least a five-minute drive apart. Lamb describes the exact same Jane Doe with the exact same physical description at both addresses. Selip represented the plaintiffs in both cases and contracted J&E for both cases.

118.  Ahmad Keshavarz, counsel for Ms. Wilson, analyzed the data in the logbook to with the following results.

119.  The Electronic Logbook shows 1881 cases given to Lamb for service. Of those, 1002 (53.2%) are for the process serving agency J&E, 782 (41.6%) are for the parent company of J&E, Inter County Judicial Services, LLC, and 95 (5.1%) are for Professional Process Servers of NY, LLC.

120.  The records that Lamb kept for cases contracted by J&E portray a pattern and practice mirroring that outlined in Sykes. Of the 1,002 cases contracted by J&E, Lamb reports a remarkable 88% rate of successful service. Of these, an astounding 98.2% were allegedly served by substitute service, while only 1.4% were allegedly personally served (0.2% are recorded as "C," "conspicuous" service, which is a method of service available only in landlord-tenant cases). Not a single instance of service by affix and mail ("nail and mail") is reported. These patterns are remarkably similar to those found in Sykes where Lamb alleged personal service in

5% of cases, substitute service in 91% of cases, and "almost never" by "nail and mail" service. Exhibit A Egleson Declaration in Sykes, p. 6, ¶ 26. **Exhibit PP** (Table service attempts by Lamb for J&E in 2023, sorting the information from the 2023 Lamb electronic logbook by whether service was effectuated and, if so, by what method).

121.  The electronic data provided to J&E (and available to S&S in the form of the actual affidavits of service in their cases) includes all of the information that would go into an affidavit of service: the method of service, the data, time and location of service; the caption and identification of document being served; the physical description of the person alleged to be served by substitute or personal service; and more.

122.  Even the most minimal scrutiny of the affidavits of service being filed would reveal the inconceivable concentration of 98.3% of attempts resulting in successful substitute service (and no use of a common method of nail and mail) and would raise a red flag about a process server's conduct.  Given Lamb's well known and well documented history this mass of improper service the misconduct here is obvious.

123.  The lack of nail and mail service should have also been a red flag, as this method of service is especially eschewed by sewer service process servers because it would require at least three trips to the address for service, each of which can be verified with GPS tracking. The fact Lamb did not have a single instance of nail and mail service out of 1,002 instances of serving civil court summons and complaints is simply impossible and a clear sign of intentionally failing to serve process.

124.  GPS tracking simply shows that a process serve was in a location and could indicate simply that the process server drove past the location; and it does not demonstrate the process server actually effectuated service as alleged.

125.   In May 2023, the month before Lamb claims to have served Ms. Wilson and J&E filed his affidavit of service, J&E contracted 116 cases to Lamb. These 116 cases made up 43.6% of Lamb's logged workload for the month of May. Of these 116 contracted jobs from J&E, 115 were civil court summons and complaints. A cross referencing search of this list of cases on New York's ECourts records reveals that Selip represented the Plaintiff in every single one of the 115 civil court cases contracted to Lamb by J&E. Lamb claims to have successfully effected service in 88.7% of these 115 cases. Lamb claims to have personally served 1 of these cases, the other 101 cases are recorded as successful substitute service. In other words, as an agent of J&E, Lamb provided 102 affidavits of service to Selip in May 2023, and claimed to have effected substitute service in 99.02% of these cases. Even though J&E and Selip knew about this large and highly suspect sample of affidavits J&E continued to employ Lamb and Selip continued to prosecute its cases where Lamb was the process server, including the case against Ms. Wilson.  **Exhibit QQ** (Table of May 2023 Lamb service attempts with J&E for Selip).

126.   Selip regularly hires J&E to serve process on its behalf. This is evidenced by the affidavits of service discussed above, from both early 2022 and summer 2023, and by an undated testimonial on J&E/Inter County's website from "Mitchell Selip, Esq., Selip & Stylianou LLP" stating that "[his] firm has been using Inter County Judicial for almost two years now." See Inter County Judicial Services, Westchester Office, https://intercountyjudicial.com/westchester/ (last visited April 3, 2025).

127.   Selip contracts J&E knowing that J&E frequently contracts Lamb and has done so for years, and that Lamb has a long and documented history of falsifying his affidavits of service.

128.  J&E notarizes Lamb's affidavits without review even though Lamb has a long and documented history of failing to serve process and falsifying affidavits, his affidavits for J&E swear to facts that are impossible on their face, and plainly incompatible affidavits from the same alleged day of service are presented at the same time to the same person at J&E (Melissa Cyran).

129.  Either J&E is, in reckless disregard of the rights of consumers, failing to perform basic supervision of Lamb that would lead to scrutiny of his facially ridiculous claims of service, or J&E is reviewing the affidavits, seeing the claims of physically impossible service, and nevertheless notarizing and submitting them in disregard to its obligation of making truthful representations of service to the courts.

130.  Had J&E exercised any care in reviewing Lamb's affidavits of service, it would have realized he was falsifying them and would have disciplined Lamb, stopped distributing process to him, and/or contracted with another process server to serve Ms. Wilson.

131.  On information and belief, Selip directs J&E to file the affidavits of service on EDDS on Selip's behalf. On information and belief, Selip either fails to review the affidavits of service before they are filed or reviews them and willfully ignores pervasive and unlikely patterns of substitute service, and the physical impossibilities they present.

### *Defendants' Sewer Service Distresses Ms. Wilson and Forces Her to Travel to Fight the False Allegations Service and Makes It More difficult to Challenge the Complaint*

132.  Because Ms. Wilson was never served, she did not receive the summons and complaint on June 8, 2023 nor did she receive it in the mail in the days following. She did not learn about the case until the end of July—and even then, she did not receive the summons and

complaint. She received instead a notice from the courts that was devoid of substantive information, so she did not know what the collection lawsuit was about.

133.   After returning home from the hospital with R., Ms. Wilson's sole focus was her new baby, whose health she continued to worry about. She had to monitor R.'s breathing through the night. She had to go back and forth to the doctor's appointments to check R.'s bilirubin levels to determine whether the jaundice needed further treatment. She had difficulty getting R. to nurse and worried about whether she was getting enough nourishment. And R. woke frequently throughout the night, making Ms. Wilson sleep deprived. The baby's father, Ms. Wilson's fiancé, was involved, but had limited capacity to help with the baby because he was working full-time.

134.   Near the end of July, Ms. Wilson received in the mail a notice from the Bronx County Civil Court informing her that she was being sued. The bare bones notice contained the case caption and index number but no substantive information about the claims against her.

135.   Ms. Wilson began to panic. She had no idea what Plaintiff's allegations were, how much she was being sued for, or how she could go about addressing case. She did not know how long the case had proceeded without her or what had happened so far. She did not know how much time, if any, she had left to do anything about the case. The only date on the Notice was 04/2022, over a year before she received the letter. The Notice said that if she did "respond" to the lawsuit, she could lose her property, including money from her bank account or paycheck, and she could not afford to lose any money. She did not know how to respond to a lawsuit; she did not even know how or where to get the court papers. She worried about how she would go to court to respond when she didn't know what the case was about and given that she was the sole caretaker of her infant daughter. She was afraid she would be arrested if she did

not go to court immediately, but didn't know how she could go to court under the circumstances. If she was arrested, she wondered, what would happen to her daughter? Who would take care of R.? And if she did go to court, given that the creditor would have a lawyer and she didn't, what would happen then?

136.  Although Ms. Wilson shared a few of these fears with her mother and fiancé, she mostly kept them to herself. But they weighed on her and prevented her from sleeping, worsening the sleep deprivation she was already suffering as a brand-new mother. She was exhausted.

137.  Ms. Wilson's stress also impacted her baby during this time: R. could sense when her mother was stressed, worried, or distracted, and in response would become more restless and upset, and would resist sleep. When Ms. Wilson noticed the change in her baby's demeanor, she would have to bury her fears to become more outwardly calm. She immediately saw a difference in R., but she felt guilty and sad that her worries were impacting her baby, whose health was already fragile.

138.  Ms. Wilson began calling different organizations but could not find anyone to help her. Eventually, however, she connected with CAMBA Legal Services, Inc. ("CAMBA"), a nonprofit legal service provider and Ms. Wilson's counsel in this federal case, who agreed to do an intake with her and ultimately agreed to represent her. Ms. Wilson had to take the subway from the Bronx to CAMBA's offices in Flatbush, Brooklyn, and had to bring R. with her because she had no other childcare. She worried about exposing R.'s vulnerable respiratory system to potential infection on public transportation.

139.  After reviewing the affidavit of service and realizing that it had been falsified, Ms. Wilson through her counsel filed a motion to dismiss. Exhibit BB (Motion to Dismiss)

140.  In order to prepare and execute her affidavit in support of her motion to dismiss, Ms. Wilson had to spend time to travel again from her home in the Bronx to CAMBA's offices in Flatbush, Brooklyn. Her mother drove her, and Ms. Wilson paid for gas and for parking in a metered spot. The sole reason Ms. Wilson had to incur these monetary damages for lost time and expenses was to fight the execution and use of the false affidavit of service.

141.  The motion to dismiss detailed why Lamb's allegations in the affidavit of service had to be false. *Id.*, pp. It also detailed the disturbing pattern of impossible claims of service that was revealed by CAMBA's review of the 39 affidavits of service in the cases filed by Selip close in time to Ms. Wilson's. *Id., pp.*

### *Selip Doubles Down on Sewer Service by Fighting the Clearly Meritorious Motion to Dismiss*

142.  Despite this evidence, Selip refused to discontinue the case and instead opposed Ms. Wilson's motion to dismiss, maintaining that Lamb's affidavit constituted "prima facie evidence of proper service" and that Lamb's history of falsifying affidavits was irrelevant. Exhibit CC (Opposition to MTD).

143.  Ms. Wilson's counsel submitted a Reply and the motion was submitted to the court. **Exhibit DD** (Reply). On the date of oral argument, Selip offered to discontinue the action with prejudice in exchange for a release of claims.  Ms. Wilson countered that she would agree to discontinue the action without prejudice, but she would not agree to the release. Selip rejected this offer. Selip's strategy of insisting on mutual releases in cases like Ms. Wilson's is done so it can further its improper conduct and continue to use sewer service to churn easy default judgments.  This way Selip is free to use process servers like Mr. Lamb that are engaging in

sewer service, if they get caught and the consumer – the vast majority of whom are *pro se* – manages to file a motion to dismiss then they can just agree to discontinue with a mutual release, using it as a get out of jail free card so they can continue their bad conduct.

144.    This is illustrated not just here but in other cases as well. For example in *Synchrony Bank v. Sharonda Gorden*, Index No. 7468-2022 (Civil Court Bronx County), **Exhibit JJ**, *Synchrony Bank v. Shardona Gorden* court file).  Ms. Gorden was sewer served by Lamb for a case involving a Synchrony account. Lamb alleges he served Ms. Gorden via substitute service on a co-tenant, Alex Matthews, but this co-tenant did not exist. Ms. Gorden lived in an SRO (single room occupancy), had no co-tenants. and was out of the apartment at the time of service.  Ms. Gorden appeared in the case but her answer was bare bones, asserting no defenses, just that her income was 72 dollars. Ms. Gorden got help from the Civil Legal Advice Resource Office ("CLARO") who helped her move to amend her answer to assert her service defense, which was granted over Selip's opposition.  Selip then moved for summary judgment. Ms. Gorden opposed and filed a cross motion to dismiss for lack of service. On the return date, Selip discontinued the action but required Ms. Gorden to sign a mutual release of claims.

145.    Selip's mutual release in Ms. Gorden's case mirrors their efforts in Ms. Wilson's and highlights how Selip tries to bury the problem of Lamb's sewer service instead of addressing it so they can keep prosecuting actions where the court lacks jurisdiction.

146.    On April 26, 2024, the court issued a decision granting Ms. Wilson's motion to the extent of setting the matter down for a traverse hearing on June 5, 2024. **Exhibit EE** (Order for Traverse). The prospect of having to prepare for and appear in court for a hearing caused Ms. Wilson additional stress and anxiety.

147.    On May 3, 2024, Ms. Wilson's attorney emailed Selip a copy of the decision

granting traverse and asked if they were still moving forward with the case. In spite of the proof in Ms. Wilson's motion to dismiss, Selip confirmed that they were moving forward and the parties agreed to exchange information in advance of the hearing. **Exhibit KK** (Selip email chain). (traverse hearing emails).

148.    As part of this exchange Selip provided Mr. Lamb's a small portion of the logbook for the day Ms. Wilson was served, June 8, 2023. **Exhibit LL** (June 8, 2023 Logbook). The logbook included not only the attempts highlighted in the affidavits Ms. Wilson attached to her motion to dismiss but other attempts that further highlight the impossibility of service. For example, after serving Ms. Wilson, at 3:16 p.m. at 3540 Decatur Avenue Apt. 1G, Bronx, NY 10467, Mr. Lamb's logbook claims he attempted service at 3:21 PM on Kohoko Timite at 281 East 205th Street Apt. 2B, Bronx NY 10467. FF. Per Google Maps, 3540 Decatur Avenue and 281 East 205th Street are a 4-minute drive apart, giving Mr. Lamb almost no time to actually perform service. **Exhibit MM** (Google Maps printout of the driving distance between 3540 Decatur Avenue and 281 East 205th Street).

149.    Upon information and belief, Selip reviewed the logbook sample in preparation from the traverse hearing. The logbook should have further confirmed to Selip that Ms. Lamb's attempts at service were impossible and that he was engaging in sewer service.

150.    On May 29, 2023, Selip emailed Ms. Wilson's attorney with another settlement offer, this time agreeing to discontinue the case with prejudice in exchange for a release just as to Selip and the Plaintiff, Synchrony Bank.  The settlement email also stated that "…going forward, our office is willing to take a look at any cases that you have wherein the process server is Benjamin Lamb." Although obtuse, Ms. Wilson's attorney took this to mean that Selip would discontinue Lamb cases against other CAMBA clients in exchange for agreeing to the settlement

with a release of claims. Implicit in this offer is an acknowledgment that Lamb is engaging in

bad conduct and allowing Selip to get default judgments from defendants who have not been

served. But, if that is the case then Selip should look at their fraudulent Lamb cases and get rid of

them, not offer favors to the lawyer who is pressing them the hardest on the issue in the hopes

that he goes away and they can continue the bad conduct.  This mirrors Selip's use of the mutual

release in Ms. Gorden's case.

### *Selip's History of Using Sewer Service*

151.    Ms. Wilson is not the first consumer to be deceived by Selip using a false

affidavit of service from a process server it knew or should have known was systemically

engaging in sewer service.

152.    Selip's history of sewer service spans decades and multiple prior firm names (i.e.

Upton, Cohen and Slamowitz).

### *Levy*

153.    On or about October 24, 2002, Selip filed a collections lawsuit in New York

County Civil Court against a consumer named Isaac Levy. **Exhibit FF** (*Levy* Complaint)

Selip chose the process serving company Capital Process Servicers, Inc. ("CPS,Inc.") to execute

an affidavit of service. Process server Gerald Murray, working for CPS, Inc. (collectively

"CPS") swore before a notary that on October 11, 2002 he served the summons and complaint on

Mr. Levy by delivering and leaving the documents with "a Jane Doe Cotenant" a resident at Mr.

Levy's dwelling which he listed as 151 1st Ave #42 New York, NY 10003-2965. Mr. Murray

stated that the Jane Doe refused to give her name and he described her as a 36-50 year old white

female who was approximately 5'4"-5'8" tall and weighed 131-160 lbs. *Id.*

154.    Mr. Levy had never lived at the address where CPS alleged service. Moreover,

Mr. Levy has never lived with anyone bearing the description of the "Jane Doe" Mr. Murray described. His roommate was 24 years old and had black hair. *Id.*

155.    Both CPS and Mr. Murray specifically are notorious for systematically executing false affidavits of service.

156.    The DCA subsequently forced Gerald Murray to surrender his license in 2013 based on misconduct in allegedly serving process, including falsifying affidavits of service. *Id.*

157.    CPS has also been disciplined by the DCA for violations of DCA rules regulating process servers. In February 2013, CPS entered into a consent order with DCA whereby CPS paid a $35,000 penalty and was required to adopt policies to protect against sewer service. *Id.*

158.    Selip used the false affidavit of service to enter a default judgment against Mr. Levy on December 15, 2003 for $1,748.47 plus 9 percent post judgment interest, or approximately $4,100 as of the date of the filing of this FDCPA action. *Id.*

159.    On December 5, 2018, Mr. Levy filed a lawsuit against Selip, CPS, Murray, and others for violations of the FDCPA for the sewer service and other misconduct stemming from it. *Id.*

160.    The case was settled for a confidential amount and dismissed on March 11, 2020.

### *Maria*

161.    On March 1, 2012, Selip initiated a lawsuit in New York County Civil Court, styled *Cypress Financial Recoveries, LLC v. Maria Maria AKA Maria D. Acosta*, Index No. CV-006298-12/NY. **Exhibit GG** (*Maria* Complaint).

162.    According to the affidavit of service, the complaint was served on Ms. Maria on or about March 31, 2012. *Id.*

35

163. These statements are false. Ms. Maria does not know anyone named Romando, and no one by that name was present in Ms. Maria's home on the day of the alleged service. Ms. Maria never received a copy of the summons and complaint in any manner. *Id.*

164. Selip used the false affidavit of service to obtain a default judgment against Ms. Maria on February 25, 2013 when Ms. Maria inevitably failed to answer the complaint. *Id.*

165. As in *Levy*, Selip used the notorious process serving agency CPS, which in turn used a process server named Nasser Atrash. *Id.*

166. Nasser Atrash has been disciplined for repeatedly executing false affidavits of service and for failing to report traverse hearings to the Department of Consumer Affairs ("DCA"). On January 28, 2014, an Administrative Law Judge for the DCA found that Mr. Atrash executed false affidavits of service in five different cases since 2009. Mr. Atrash's process server's license was revoked and DCA imposed a $30,500 fine.

167. Like Defendant Bejamin Lamb in this case, Atrash was also featured in the Egleson Declaration from the *Sykes* case, finding that on 34 different occasions Nasser Atrash reported serving process at 2 or more locations at the same time. **Exhibit A, at p. 9.**

168. On November 7, 2016, Maria Maria filed an FDCPA lawsuit against Selip, CPS, Atrash, and others for violations of the FDCPA and state law related to their sewer service against her.

169. The lawsuit was settled and was dismissed on February 27, 2018.

*Watkins*

170. Selip also used the infamous process server Atrash in a collection lawsuit it filed in 2012 captioned *Midland Funding, LLC v. Loretta Watkins*, Index Number 8375/2012. **Exhibit HH** (*Watkins* Complaint).

171.    Process server Nasser H. Atrash swore in his Affidavit of Service that he served John Watkins, a "co-tenant," with the Summons and Complaint on May 8, 2012 and later mailed a copy to Ms. Watkins. *Id.*

172.    However, Ms. Watkins never received the Summons and Complaint by mail or by any other manner, and did not know about the collection lawsuit. *Id.*

173.    In November 7, 2012, Selip used the false affidavit of service to obtain a default judgment against Ms. Watkins in the amount of $12,503.95.

174.    While the subsequent FDCPA lawsuit brought by Ms. Watkins against Selip was not for sewer service because the claim was time-barred, it nevertheless notes that "the sewer service is relevant for damages for Ms. Watkin's FDCPA claims that are not time barred: that Selip attempted to garnish her wages in 2019 after she had in fact vacated the judgment."

175.    On October 16, 2020, judgment was entered against Selip and Selip partner David Cohen for $25,000 pursuant to an Offer of Judgment.

176.    Another lawsuit was filed by Ms. Watkins in New York Supreme Court, County of Kings against Selip for its violations of state law in relation to its attempts to collect on a vacated sewer service judgment, and as of this filing is still pending.

## FIRST CAUSE OF ACTION

Violation of the FDCPA, 15 U.S.C. §§ 1629e 1692f

*Against All Defendants*

177.    The purpose of the FDCPA is "to eliminate abusive debt collection practices by debt collectors, to ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action

to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e).

178.    The FDCPA, 15 U.S.C. § 1692e, prohibits a debt collector from using a "false, deceptive, or misleading representation or means in connection with the collection of any debt."

179.    The FDCPA, 15 U.S.C. § 1692f, prohibits a debt collector from using "unfair or unconscionable means to collect or attempt to collect any debt."

180.    Defendants violated the FDCPA, §§ 1692e, 1692f, by using false, deceptive, and misleading representations and means and by engaging in unfair and unconscionable practices in connection with the collection of the alleged debt from Ms. Wilson.

181.    Defendants' violations include, but are not limited to:

•    Failing to lawfully effectuate service of process;

•    Preparing and signing a false affidavit of service;

•    Filing a false affidavit of service with the court;

•    Filing a false affidavit of service without meaningful attorney review;

•    In bad faith, unduly prolonging legal proceedings and continuing to present the false affidavit of service as valid.

182.    Defendants' violations inflicted on Ms. Wilson economic injuries, including but not limited to out of pocket expenses for travel to an attorney's office to oppose Defendants' motion to dismiss. Defendants' violations also caused Ms. Wilson emotional distress.

183.    These are concrete and particularized injuries that have a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts. They are analogous to common law claims like malicious civil prosecution, abuse of process, and other wrongful litigation torts.

184.    Defendants had a duty to exercise reasonable care in the collection of debts,

38

including in the selection of companies to attempt to collect the debt and in ensuring that the affidavit of service filed was accurate.

## SECOND CAUSE OF ACTION

Violation of N.Y. Gen. Bus. L. § 349

*Against All Defendants*

185.    New York General Business Law Section 349(a) prohibits "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state."

186.    An individual "injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such action." N.Y. Gen. Bus. Law § 349(h). Such an individual may also be awarded punitive damages.

187.    Defendants violated N.Y. Gen. Bus. Law § 349 *et seq.* by using consumer-oriented deceptive acts and practices in the conduct of their businesses.

188.    As a direct and proximate result of those violations of N.Y. Gen. Bus. Law § 349 *et seq*, Plaintiff suffered compensable harm and is entitled to preliminary and permanent injunctive relief, and to recover actual, treble, exemplary, and punitive damages, together with costs and attorney's fees.

## THIRD CAUSE OF ACTION

Violation of Judiciary Law § 487

*Against Selip*

189.    An attorney who "[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party" is owes treble damages

to a party injured by such deceit or collusion. Judiciary Law § 487.

190.    Selip violated Judiciary Law § 487 by filing a false affidavit of service with intent to deceive the court.

191.    Selip's conduct inflicted economic injury and emotional distress on Ms. Wilson.

## **FOURTH CAUSE OF ACTION**

Violation of N.Y.C. Admin. Code § 20-409.2

*Against Lamb and J&E*

192.    Under New York City Administrative Code § 20-409.2, "[a]ny person injured by the failure of a process server to act in accordance with the laws and rules governing service of process in New York state" has "a cause of action against such process server and process serving agency, which distributed or assigned process for service." Injured individuals may recover compensatory damages, punitive damages for willful failure to service process, injunctive and declaratory relief, costs, and attorneys' fees. *Id.*

193.    Defendants Lamb and J&E violated New York City Administrative Code § 20-409.2 by failing to act in accordance with the laws and rules governing service of process in New York. Defendants' violations include but are not limited to:

- Failing to lawfully effectuate service of process; and

- Preparing, signing, notarizing, and filing a false affidavit of service.

194.    Defendants' failure to serve process was willful.

195.    As a direct and proximate result of these violations of New York City Administrative Code § 20-409.2, Plaintiff has suffered and continue to suffer compensable harm

and is entitled to recover compensatory and punitive damages, costs, and attorneys' fees.

## FOURTH AND FIFTH CAUSES OF ACTION

Negligence and Gross Negligence

*Against all Defendants*

196.    Defendants, as debt collectors and process servers, owed Ms. Wilson a duty of reasonable care in their debt collection efforts.

197.    Defendants' failure to exercise even slight care or diligence amounts to gross negligence.

198.    Lamb actively shirked his duty of reasonable care by intentionally fabricating the affidavit of service in Ms. Wilson's case.

199.    Selip is well aware of J&E's use of Lamb as a process server. Selip and J&E are both well aware of Lamb's history of sewer service.

200.    Had Defendant Selip and/or J&E made even the smallest effort to review affidavits of service submitted by Lamb, they would have seen that process could not have been served in the manner Lamb alleged. They would not have filed those affidavits and/or would have ceased distributing process to him.

201.    Selip could have contracted service in Ms. Wilson's case to another process serving agency or process server, or J&E could have contracted service to another process server. Ms. Wilson would have received proper notice of the lawsuit and complete information about the claim against her.

202.    Once Selip received Ms. Wilson's motion to dismiss, it should have seen that the court lacked jurisdiction because Lamb's affidavit of service was false. It should have consented to discontinuing the lawsuit.

203. J&E's negligent selection, hiring, training, supervising, and use of Defendant Lamb to serve process on Ms. Wilson and others was not a one-off mistake. J&E's entire practice of hiring and using of process servers is, at minimum, negligent for failing to investigate or outright ignoring the history of misconduct of the process servers. J&E's practice of notarizing and submitting affidavits of service that are false is also at minimum negligent for failing to review or ignoring affidavits of service detailing impossible attempts at service.

204. As a result of Defendants' actions, Ms. Wilson was injured.

205. In addition, Defendants' actions evince a reckless disregard for the rights of others and smack of intentional wrongdoing.

206. Defendants' conduct was part of a broader pattern of misconduct aimed at the public in general.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the following relief:

a. A declaration that all Defendants have committed the violations of law alleged in this action;

b. Statutory damages;

c. Reasonable attorney's fees and costs;

d. Actual damages;

e. Compensatory damages;

f. Treble damages;

g. Exemplary and punitive damages;

h. An order, pursuant to GBL 349(h) and N.Y.C. Admin. Code § 20-409.2, enjoining

42

and directing Defendants to cease violating those statutes;

i. Prejudgment and post judgment interest as allowed by law;

j. All other relief, in law and in equity, both special and general, to which Plaintiff

may be justly entitled.


## JURY DEMAND

Plaintiff respectfully requests a trial by jury.

Dated: Brooklyn, New York

      April 3, 2025


                Respectfully submitted,


            By: *Ahmad Keshavarz, Esq.*
            LAW OFFICE OF AHMAD KESHAVARZ
            Ahmad Keshavarz, Esq.16 Court St., Suite 2600
              Brooklyn, NY 11241
              Phone: (718) 522-7900
              ahmad@NewYorkConsumerAttorney.com

              CAMBA LEGAL SERVICES, INC.
              Divya Subrahmanyam, Of Counsel
              Matthew Schedler, Of Counsel
              Elizabeth Miller, General Counsel
              20 Snyder Ave.
              Brooklyn, NY 11226
              Phone: (718) 940-6311
              DivyaS@camba.org
              MatthewSc@camba.org